## ROBERT C. STOUTENBURGH *v.* CALVIN TOMPKINS.

1. A court will not decree specific performance where it would be inequitable under all the circumstances of the case. Where a contract is hard and destitute of all equity, the court will leave parties to their remedy at law.

2. An agreement may be fully proved; it may be clear in every particular, and upon its face equal and just in all its parts; the defendants may be unable to prove any mistake, fraud or accident in reference to its execution, and yet the conduct of the complainant may have induced such a state of things in relation to the subject matter of the agreement as would make it not only proper, but the plain duty of the court to refuse its aid in enforcing its specific performance.

3. It follows, that however closely the court may be disposed to adhere to the salutary rule of law, that parol evidence is not admissible to vary, contradict or control a written instrument, it must necessarily exercise much more liberality in admitting evidence in order to reach the equity of the case, than would be allowed by a court of law.

4. Courts of equity have manifested much more liberality in admitting parol evidence in cases of specific performance to resist than to enforce it. Yet the principle has never been established by authority, that such evidence is admissible, even in defence, to *vary* or *contradict* a written agreement.

5. A defendant cannot resist a specific performance, on the ground that the agreement entered into differs from that which was reduced to writing, without showing that the difference was the result of fraud, mistake, accident or surprise.

6. But there is a great difference between introducing parol evidence for the purpose of showing that the writing does not express the *true intention* of the parties, and introducing it for the purpose of showing the circumstances which make it inequitable and unconscientious, that the intention should be carried out.

7. It is well settled that specific performance is discretionary with courts of equity, and a defendant will generally succeed in procuring a dismissal of the bill, if he convinces the court that the exercise of the jurisdiction will be inequitable under the circumstances.

8. One who has been in the enjoyment of property under an agreement, and has surrendered and abandoned it; who has betrayed the confidence existing between the parties, and has by his conduct and dealings with the defendant, and his treatment of the property, beguiled the defendant into the belief that he intended to give up all his rights and interest in the contract, comes into court with a case wholly void of equity, when he demands a specific performance.

9. A want of mutuality is an objection to a decree for a specific performance.

10. The court will not enforce a contract where the parties are not mutually bound to fulfill it. (*Authorities reviewed.*)

11. So where the interest of a party in a contract passed into the hands of his assignee in bankruptcy, all reciprocity as to the remedy was destroyed; and if the assignee, or a person holding under him, seeks a specific performance, he must affirm the contract and make it mutual, at least within a reasonable time.

This was a bill for the specific performance of an agreement in writing, entered into the 4th day of February, 1841,

—bill filed October 10th, 1846.　Hearing upon bill, answer, replication and proofs.

*W. K. McDonald* and *A. Whitehead*, for complainant.

*J. P. Bradley* and *J. C. Hornblower*, for defendant.

THE CHANCELLOR. This bill is filed to compel the specific performance of an agreement, which was entered into in writing between the defendant and one Henry Wilde, on the fourth day of February, A. D. 1841.

By the agreement, the defendant, for the consideration of one dollar then paid, and the further sum of three thousand three hundred and forty-six dollars to be paid, for himself, his heirs, executors and administrators, agreed with the said Wilde, his heirs, executors and administrators, that the said defendant, his heirs and assigns, should and would, on the payment of the last-mentioned sum of money as thereinafter mentioned, convey and assure to the said Wilde, and to his heirs and assigns, all the four undivided one-hundredth parts of those certain tracts or parcels of land situate, lying and being in Ulster and Rockland counties, New York, the said tracts of land being intended to embrace all the real estate owned jointly by the defendant, Jotham Hedden, Ira Van Geison, Reuben D. Baldwin and Daniel Tompkins, comprising the firm of Tompkins, Hedden & Co., and that he, the defendant, would, at the same time, sell and transfer unto the said Wilde, his heirs and assigns, twenty-four shares of the capital stock of the Newark Lime and Cement Manufacturing Company.　Henry Wilde, for himself, his heirs and assigns, covenants to pay for the said land and stock, on or before the 4th of February, 1846, the sum of eight hundred and forty-six dollars, with interest at six per cent. per annum, that might accrue from the date of the agreement to the time when the said payment should be made as aforesaid, and also would, at the time the said payment should be made, (at which time the conveyance of the premises and stock should be made), execute a bond in the penal sum of five thousand dollars, conditioned for the payments of the sum

of two thousand five hundred dollars, together with such additional sum as should be equal to the interest accruing to that time, in one year from the date thereof, with interest semi-annually, which bond should be secured by a mortgage on the premises and stock. It was further agreed that the defendant, in addition to the said land and stock aforesaid, would, at the same time, also sell and convey, for the same sum before mentioned, four undivided hundredth parts of the personal property, fixtures, accounts, notes and bills of exchange, profits, appurtenances, and other advantages which should in the meantime accrue and result from, or on account of the business, at the time of the date of the agreement carried on, and to be continued on the real estate before mentioned, and to the same extent that the said Henry Wilde would be entitled to receive, if he were an actual partner in the business conducted, going on and connected with the said real estate, to the extent of four one hundredth shares of the said business. It was further, by the said agreement, declared to be the general intent of the parties thereto, that the said Henry Wilde should purchase the real estate and capital stock aforesaid unencumbered, and have his proportionate share in the profits of the operation then going on, and to be continued on the said real estate, and that the said defendant should receive therefor the sum of thirty-three hundred and forty-six dollars, with interest from the date of the said agreement.

On the 18th of June, 1842, about sixteen months after the date of the agreement, Wilde filed his petition in the District Court of the District for New Jersey, for the benefit of the bankrupt law; and in his schedule of property was included his interest in this agreement.

On the 12th of July, 1842, he was declared a bankrupt; and on the 16th of that month James Hewson was appointed his assignee; and the agreement, with Wilde's other property, passed into his assignee's hands.

On the 23d of March, 1843, the assignee sold the interest of Wilde in the agreement at public auction, and the com-

plainant being the highest bidder, it was struck off to him at the sum of three dollars and seventy-five cents.

On the 6th of October, 1845, the assignee executed and delivered to the complainant a deed of assignment of all his right, title, and interest in the said agreement.

On the 10th of October, 1846, the bill of complaint in this suit was filed.

The defendant relies upon the general ground that it would be inequitable and unjust, under all the circumstances of the case, to compel him specifically to perform this agreement.

This is a good defence. The court will not become an instrument of injustice; and if the case presented is such that it would be unconscientious to grant the complainant the relief he seeks, and repugnant to a just sense of right between man and man, the court will refuse its aid.

" The exercise of this branch of equity jurisprudence (2 *Story*, § 742,) is not a matter of right in either party; but it is a matter of discretion in the court; not, indeed, of arbitrary or capricious discretion, dependent upon the mere pleasure of the judge, but of that sound and reasonable discretion which governs itself, as far as it may, by general rules and principles; but, at the same time, which withholds or grants relief, according to the circumstances of each particular case, when these rules and principles will not furnish any exact measure of justice between parties."

This principle is recognized by all the authorities, and very clearly by Mr. Justice Thompson, in the case of *King and others* v. *Hamilton and others*, 4 *Peters* 311. " A court will not decree specific performance, where it would be inequitable, under all the circumstances of the case. The power of a Court of Chancery to enforce a specific execution of a contract is a very valuable and important one, but it is to be exercised under the sound discretion of the court, with an eye to the substantial justice of the case. Where a contract is hard, and destitute of all equity, the court will leave parties to their remedy at law."

An agreement may be fully proved—it may be clear in

every particular, and upon its face equal and just in all its parts—the defendant may be unable to prove any mistake, fraud, or accident, in reference to its execution ; and yet the conduct of the complainant may have induced such a state of things in relation to the subject matter of the agreement as would make it not only proper, but the plain duty of the court to refuse its aid in enforcing its specific performance.

If such are the principles by which a court of equity is governed, in the exercise of this branch of its jurisdiction, it follows that, however closely the court may be disposed to adhere to the salutary rule of law—that parol evidence is not admissible to vary, contradict, or control a written instrument—it must necessarily exercise much more liberality in admitting evidence in order to reach the equity of the case, than would be allowed by a court of law. It is vain to say that a court of equity will refuse its aid to compel a party to do what a conscientious man ought not to ask him to do, under all the circumstances of the case ; and yet, by a strict application of a principle of law, forbid his proving the circumstances which establish the hardship and inequity of the case.

The question as to the extent to which courts of equity have gone, in admitting parol evidence in cases of specific performance, was argued at much length and with great ability by the counsel in this case. It was insisted by the complainant's counsel that, while a distinction had been drawn as to the admissibility of such evidence between cases where it was offered on behalf of the complainant, and when on that of the defendant, and much more liberality manifested in its admission to resist, than to enforce a specific performance, yet that the principle had never been established by authority, that such evidence is admissible, even in defence, to *vary* or *contradict* a written agreement. I think the counsel were right. A defendant cannot resist a specific performance on the ground that the agreement entered into differs from that which was reduced to writing, without showing that the difference was the result of fraud, mistake, accident, or surprise. The case of *Legal* v. *Miller*,

2 *Ves.* 299, and some others cited on the argument, do not, on careful examination, establish a contrary doctrine.

But there is a great difference between introducing parol evidence for the purpose of showing that the writing does not express the *true intention* of the parties, and in introducing it for the purpose of showing the circumstances which make it inequitable and unconscientious that the intention should be carried out. A written contract may be abandoned by parol, if not so as to destroy the rights of the parties at law, at least so far as to constitute a good defence to a bill for specific performance. So if it has been varied by a subsequent parol agreement, which has been carried out, and so acted upon by the parties that the written agreement cannot be enforced without injury to one party, it is a good ground of defence, and may be proved as such. *Legal* v. *Miller*, 2 *Ves., Sr.,* 299; *Price* v. *Dyer*, 17 *Ves.* 357; 2 *Johns. Ch.* 216; *Gormon* v. *Salisbury*, 1 *Vern.* 240. In *vol.* 2, *part* 1, *Leading Cases in Eq.* 514, the principle, as deduced from a large number of authorities there cited, is said to be, that a defendant, in a bill brought to enforce a specific performance, is not exempted from the ordinary rules of evidence, nor entitled to vary a written contract by parol, without showing fraud or mistake, to justify the variation. But it is equally well settled that specific performance is discretionary with courts of equity, and a defendant will generally succeed in procuring a dismissal of the bill, if he convinces the court that the exercise of the jurisdiction will be inequitable under the circumstances.

The defendant offers to show that the circumstances of this case place him in a position in which it would be unjust and against equity to compel him specifically to perform the agreement. He offers to show the character of the property which is the subject matter of the agreement, the business relationship of the parties in connection with the property, its enjoyment by Wilde under the agreement, and then its surrender and abandonment; that while his own conduct has been honest and liberal towards Wilde in reference to the contract, Wilde voluntarily, to the great detriment of the

defendant, destroyed its mutuality, betrayed the confidence existing between the parties, and that he has by his conduct and dealings with the defendant, and his treatment of the property, beguiled the defendant into the belief that he intended to give up all his rights and interest in the contract. The defendant insists that the complainant purchasing the property for the sum of three dollars and seventy-five cents, in view of all the circumstances, and then delaying for more than three years before he even gave notice to the defendant of his claim, comes into court with a case wholly void of equity.

I shall exclude all the evidence going to show an agreement by parol, independent of the written agreement, which varies or contradicts it; but all the evidence bearing upon the particulars to which I have alluded, violates no rule as to the admission of testimony, and must be examined in order to reach the equity of the case.

Let us now examine the circumstances of the transaction, in order to ascertain the equities between the parties.

By the agreement, the defendant was to convey to Wilde the four undivided one-hundredth parts of certain real estate owned jointly by the defendant and Elias Tompkins, Jotham Hedden, Ira Van Geisen, Reuben D. Baldwin and Daniel Tompkins, comprising the firm of Tompkins, Hedden & Company, and twenty-four shares of the capital stock of the Newark Lime and Cement Manufacturing Company.

Prior to the year 1840, the firm of Tompkins, Hedden & Co. were carrying on the business of burning, manufacturing and selling lime, cement and plaster. Their principal establishment was located at Newark, where they owned valuable property; and in addition to their property at Newark, they were the owners of the real estate mentioned in the agreement. The property was divided into one hundred parts, of which the defendant owned thirty-five hundredths, and the other persons interested owned the residue in different proportions. In February, 1840, the Newark Lime and Cement Manufacturing Company was incorporated. The property of the firm of Tompkins, Hedden & Co., located at Newark, was converted into the capital stock of the

corporation, at a valuation of sixty thousand dollars, so that each co-partner received six shares, or six hundred dollars in the capital stock of the corporation for any one undivided one hundredth part owned by him in the co-partnership property. The remainder of the property and business of the firm of Tompkins, Hedden & Co., continued to be held and conducted in the same manner as was done before the act was passed. Every person interested as a partner and stockholder, was actively employed in the business of the concern, for which each received a fixed weekly allowance' in cash.

The real estate in New York was held in hundredth parts by the stockholders in the corporation, in proportion to the capital stock of the corporation respectively held by each of them. Of course any six shares in the corporation were entitled to one hundredth part in the real estate.

Prior to the execution of the agreement in controversy, Wilde was in the employment of the corporation and co-partnership, receiving a salary of six hundred dollars per annum.

He entered into an agreement with the co-partners and the stockholders in the corporation, for the purchase of eight shares in the whole concern, which was forty-eight shares of the stock, and eight undivided hundredth parts of the real estate. Of this interest, two and one-half shares were to be furnished by the defendant, three by Wheeler, one by Baldwin, one and one-half by Ambrose Tompkins. A memorandum of this agreement was made in writing by Wilde himself. It constituted a part of the minutes of a joint meeting of the Newark Lime and Cement Manufacturing Company, and the firm of Tompkins, Hedden & Co., of which meeting Wilde acted as the clerk, and is dated January 5th, 1841. The agreement in controversy was entered into between the parties to carry out that portion of the arrangement of January 5th, 1841, which devolved upon the defendant. The defendant was to furnish two and one-half shares, but as his brother, Ambrose Tompkins, was to furnish one and one-half shares, and his shares were in the name of the defend-

ant, who held them in trust, he bound himself to convey four hundredth parts of the real estate, and twenty-four shares of the capital stock, being equivalent to the two and one-half shares which he was to furnish, and the one and one-half shares his brother Ambrose was to furnish, under the arrangement of January 5th, 1841.

Under the arrangement of January, 1841, Wilde entered into the immediate enjoyment of his purchase. He was to receive, by a further understanding between the parties in interest and himself, the actual profits on seven shares, from January, 1840, he paying interest on the shares valued, at the rate of $80,000 for the whole property.

That this was the understanding, is proved by a letter written and sent by Wilde to Tompkins, Hedden & Co., showing who were to furnish the shares, and when the interest of Wilde in them was to commence. It is shown, also, by the endorsement in the agreement between Wilde and the defendant. On the agreement there is endorsed, in Wilde's handwriting, dated February 4th, 1841, a receipt for one hundred and twelve dollars principal. This receipt is open to explanation, and it is competent for the defendant to show how this money was paid. It appears that on the first of February, 1841, the company declared a dividend of twelve per cent. on their capital stock, which, on the twenty-four shares, amounted to two hundred and eighty-eight dollars. After deducting from this sum the interest of the purchase money for the year 1840, it left the sum of one hundred and twelve dollars due Wilde, and this was endorsed as so much paid on the principal. There are two other endorsements on the agreement, both dated January 1st, 1842; one of one hundred and seventy-five dollars and fifty cents interest, and the other of one hundred and eighty-four dollars and forty-four cents for principal. On the 13th January, 1842, the company declared another dividend of fifteen per cent., which, on the twenty-four shares, amounted to three hundred and sixty dollars; of this sum, the one hundred and seventy-five dollars endorsed was the one year's interest on the principal then due, of three thousand

two hundred and thirty-four dollars, from the date of the agreement, the balance, being one hundred and eighty-four dollars and forty-four cents, was a credit on the principal. And, further, Wilde gave up his salary of six hundred dollars a year, and received for the year 1840, and up to August, 1842, the same weekly wages which were received by the other members of the firm; and, at the joint meeting of the Newark Lime and Cement Manufacturing Company, and the firm of Tompkins, Hedden & Co., he enters himself in the minutes as one of the parties in interest, present.

Thus it satisfactorily appears that Wilde entered into an arrangement with the firm of Tompkins, Hedden & Co., to become a member of that firm, and that on the 5th of January, 1846, he made a memorandum, in writing, in the presence of the members of the co-partnership, of the interest which he was to have in it, and which of the individual members of the firm were to furnish the interest, and in what proportions; that he immediately became an active member of the firm, upon the same terms with the other individuals composing it, and actually received, for a part, at least, of his interest, the proceeds and profits. The agreement, which he entered into in writing, in the following month, with the defendant, was a part of the agreement entered into by him with the firm, January 5th, 1841. It was executed for the very purpose, and did, by its terms, secure to Wilde, in part, the benefit of the agreement he had made with the firm. The defendant has a right to have it construed in connection with that agreement. He has bound himself to convey to Wilde a certain interest in a co-partnership, and agrees that Wilde shall have an account for four undivided hundredth parts of the personal property, fixtures, accounts, notes, bills of exchange, profits, appurtenances, and other advantages which shall accrue, or result from or on account of the business carried on by the said firm, from a certain period of time. The moment he fulfills that agreement, the firm are driven to the necessity of taking Wilde into partnership, or they must dispose and settle up their concerns, in order to ascertain Wilde's interest. In view of these

consequences, is it not competent to show that the agreement now sought to be enforced was based upon an agreement made between Wilde and the firm? and may not the prayer of this bill be successfully resisted on the ground that to compel a specific performance in this case, would be hard and inequitable, in consequence of Wilde's violating the agreement upon which the one now in question is founded?

Suppose that, immediately after making this agreement, Wilde had abandoned the one he had entered into with the firm, would it not have been a clear fraud for him to have turned around upon the defendant and demanded of him an execution of his agreement? The complainant stands in no better situation than Wilde himself would have stood, had he filed the bill. If Wilde abandoned the agreement he made with the firm—the one he made with the defendant being based upon the former, and having been executed for the purpose of carrying it out—the defendant may successfully resist a specific performance, on the ground of such abandonment. Wilde did not carry out the agreement of January, 1841. He abandoned it, as is conclusively shown from the fact that, in making out a schedule of his property, in his application for the benefit of the bankrupt law, he claimed no benefit under that agreement. This is shown, also, from other abundant testimony in the cause, which it is unnecessary to refer to, as the fact was not disputed on the argument. Upon this view of the case, my opinion is, the complainant is not entitled to call for a specific performance.

But let us examine further, and see how the equity of the case is affected by the conduct of the complainant himself.

A want of mutuality is an objection to a decree for specific performance in this case. Let us see how far the court has carried this objection.

In the case of *Hatton* v. *Gray*, 2 *Ch. Ca.* 164, Hatton sold houses to Gray for two thousand pounds. The note of the agreement was signed by Gray only. The solicitor said, in argument, " The note binds not him who signed it not, for

the statute of frauds and perjuries, &c., and therefore in equity cannot bind the other party, for both must be bound or neither of them, in equity." But it was decreed contrary. *Armiger* v. *Clarke, Bunbury's Rep.* 110. The bill was dismissed *per totam curiam*, chiefly upon the principle that the remedy was not mutual.

In *Owen* v. *Davies*, 1 *Ves., Sr.*, 82, the bill was for a specific performance of an agreement with one since become a lunatic, for the sale of a reversion upon an estate for life. It is apparent, from the report of the case, that the defence insisted on was, that the remedy was not mutual, because the rights of the parties were altered on account of this change in the condition of one of the parties. The Lord Chancellor did not deny the principle contended for. He said " It is certain that the change of the condition of a person entering into an agreement, by becoming lunatic, will not alter the rights of the parties, which will be the same as before, provided they can come at the remedy. As if the legal estate is vested in trustees, a court of equity ought to decree a performance; and the act of God should not change the rights of the parties; but if the legal estate be vested in the lunatic himself, that may prevent the remedy in equity, and leave it at law."

In 1 *Atk.* 2, *Stapilton* v. *Stapilton*, the general rule was admitted. The mutuality was destroyed by the act of God. The agreement was such that both parties run this same risk. The Lord Chancellor said : " The chance was equal, who died first, Henry or Philip."

In 1 *Schoales and Lefroy* 18, *Lawrenson* v. *Butler*, Lord Chancellor Redesdale is for adhering to the rule as to mutuality, most rigidly. He remarks in that case : " It is said that courts of equity have decreed performance in cases where one party only was bound by the agreement. I believe it would be difficult to find a case where that has been done, particularly a late case. In the case of *Hatton* v. *Gray*, 2 *Ch. Cas.*, it was considered as sufficient that the agreement should be signed by the party against whom the performance was sought, because such are the words of the

statute of frauds; now, such certainly is the import, that no agreement shall be in force but when it is signed by the party to be charged; but the statute does not say that every agreement so signed shall be enforced; the statute is in the negative. To give it this construction would, as I have heard it urged, make the statute really a statute *of frauds,* for it would enable any person who had procured another to sign an agreement, to make it depend on his own will and pleasure whether it should be an agreement or not.

But this *dictum* of Lord Redesdale, that an agreement signed by one party only cannot be enforced against that party, is not law. Since this case in *Schoales & Lefroy,* it has frequently been otherwise decided. The master of the rolls in 2 *Jacob & Walker* 428, *Martin* v. *Mitchell,* seems to think that the party who had signed had a *locus penitentiæ,* and was at liberty to recede until the other had signed, or in some manner made it binding upon himself.

In the case of *Flight* v. *Bolland,* 4 *Russ.* 675, it was decided that an infant cannot sustain a suit for the specific performance of a contract, because the remedy is not mutual.

But in *Clayton* v. *Ashdown,* 2 *Vin.* 393, *pl.* 1, a specific performance made by an infant was decreed, on the ground that the infant had attained his full age, and had affirmed the contract before the bill was filed.

In the cases already referred to, where the suits were maintained or agreements signed only by one party, it was, as was remarked by the master of the rolls in 4 *Russell,* first because the statute of frauds only requires the agreement to be signed by the party to be charged; and next, it is said that the plaintiff, by the act of filing the bill, has made the remedy mutual.

From a review of all the authorities it will appear to be an objection to decreeing a specific performance. That the parties are not mutually bound to fulfill it, and that the court will not enforce such a contract, when the party who is not bound by the agreement has taken an undue advantage of his position, to the injury of the other party. For instance, if an infant may make a contract mutual by affirm-

ing it after he comes of age; if the property is of a character subject to fluctuation in its value, the court would not allow him to speculate upon his position, and take his own time to affirm the contract. A want of diligence might, under such circumstances, be sufficient ground for the court's refusing its aid.

To apply the rule to the case before us. This contract is mutual in its terms, and there is a mutuality of remedy to the parties. The one agrees to sell at a fixed price, and the other covenants to give it. If either party had died, the mutuality of remedy would not have been destroyed. The representatives of the deceased party would have been bound to fulfill the contract, or if Wilde had sold and assigned his interest, Tompkins could still have enforced the agreement against Wilde. But the moment Wilde's interest in this contract passed into the hands of his assignee in bankruptcy, all reciprocity as to the remedy was destroyed. I am not willing, however, to say that the mere fact of the mutuality being destroyed under these circumstances, the court, on that account, should refuse its aid to enforce a specific performance. Such an application of the rule might contravene the policy of the bankrupt law, by depriving the creditors of a beneficial interest in a valuable part of the bankrupt's estate. But if the assignee, or a person holding under him, seeks a specific performance, he must affirm the contract and make it mutual, at least within a reasonable time. If he takes advantage of his position to speculate upon the opposite party, a court of equity will not encourage or aid him in such speculation. By the terms of the agreement in question, Wilde was entitled to a conveyance of the property, on his paying the consideration money, at any time on or before the 4th of February, 1846. The assignee came into the possession of the contract July 16th, 1842. He took no steps towards assuming its responsibilities, or enforcing its fulfillment, but ten months afterwards sold at public auction, all his right, title and interest in it to the complainant, for three dollars and seventy-five cents.

What was the relative situation of the complainant and

defendant at this time? Here was an agreement which the defendant could enforce against no one. It related to property from its very character fluctuating in its value. Could the complainant rest upon his oars until February, 1846; then, if, in the meantime, the property doubled in value, demand it, at his pleasure, of the defendant; or if it became valueless, be at liberty to cast it, a burthen, upon him, without any means of redress for such a wrong? And all this without any negligence or want of foresight in the defendant. The contract was made before the bankrupt law was passed, and, of course, the defendant could not anticipate, and, therefore, did not provide against such a contingency.

Would it be equitable, under such circumstances, for this court to countenance the complainant in taking advantage of his position, and in speculating upon the defendant; and more especially, when he risks only three dollars and seventy-five cents in the adventure?

The complainant waited until the 7th of October, 1845, about four months before the time for executing the contract expired, and for more than three years after his purchase, and then formally tendered himself ready to assume its responsibilities. In the meantime the property increased some fifty per cent. in value.

My conclusion is, the bill must be dismissed, but without costs. I am induced to make the decree without costs, in consequence of the conduct of the defendant when he was called upon to perform the contract, and on account of which he is, in a measure, responsible for the institution of this suit.

CITED in *Huffman* v. *Hummer*, 3 *C. E. Gr.* 90; *Crane* v. *Decamp*, 6 *C. E. Gr.* 418.