This is a vendor's suit to enforce specific performance of a written contract for the sale of a farm in Elk Township, Gloucester County, New Jersey. The vendees (husband and wife), by special defenses and a counter-claim, charge the complainant with intentional misrepresentation of a material fact, and pray a decree rescinding the contract, requiring its surrender and the return of moneys paid on account of the purchase price.
The farm contains 73 1/2 acres. It fronts on the Clayton-Aura Road and extends back, a third of a mile, to Buck Road. Its northeasterly boundary line, generally speaking, parallels the high water line of Silver Lake. This lake, with the land along its opposite shore, was purchased by Mr. Linton Silver in August, 1920. He developed his property as a modest summer resort, and there are now 28 summer cottages which face the lake. Cottagers enjoy lake privileges; they bathe from a beach opposite their cottages and near the farm house of the complainant.
The defendants are not farmers. When, in June, 1946, they became interested in Silver Lake and the possible purchase of complainant's land, they lived in Woodbury Heights, in Gloucester County, and Mr. Giron operated a small electrical supply business. They conceived the idea of buying complainant's farm and developing it as Mr. Silver had developed his land. Lake frontage and lake privileges were, of course, all important to their plan. They assert that they made this clear to the complainant, and that she assured them her land ran to, along, and at some points under the lake, and that she enjoyed lake privileges. Upon this representation, the defendants say, they agreed to purchase complainant's farm for a high price, $15,000. The representation, they charge, was false in fact and fraudulently made.
The misrepresentation alleged, I am persuaded, was made by the complainant. I am not so certain that it was fraudulently perpetrated, but that is unessential to a determination of the case.
On a bill for specific performance this court will grant or refuse its aid according to the justice of the case; it will *Page 495 
never extend its aid to a suitor who procured execution of the contract by misrepresentation of a material fact. The remedy by specific performance is discretionary; the question is not what must the court do, but what, in view of all the circumstances of the case, should the court do to further justice. Plummer v.Keppler, (Court of Chancery), 26 N.J. Eq. 481, 482; Johnson
v. Somerville (Court of Chancery), 33 N.J. Eq. 152, 153;
affirmed, Ibid. 621. And, "An unintentional misrepresentation of a material matter will be operative as a bar to a decree for specific performance. * * * The material inquiry is not whether a complainant intended to mislead defendant, but is, Did he mislead him?" Williams v. M.E. Blatt Co. (Court of Errors andAppeals), 95 N.J. Eq. 326; 123 Atl. Rep. 362.
The evidence is such that I cannot escape the conviction the complainant misled the defendants as to the material and valuable features of lake frontage and lake privileges, and that the defendants agreed to the price asked and executed the contract believing they were acquiring both. A real estate broker, specializing in the sale of land in southern New Jersey, testified that the fair market value of complainant's property for use as a farm was $7,500. The defendants, enamoured of their scheme of development and believing it feasible because they were to get almost a third of a mile of lake front with lake privileges, agreed to pay $15,000. Before agreeing to purchase, the defendants called upon the complainant and told her they wished to look over the land; they walked down to the bathing beach and then returned for their automobile and drove all along the lake to Buck Road. Except at the beach, for about one hundred feet, access to the lake was nowhere barred and, in the fence enclosing the beach there was a large padlocked gate, opening upon complainant's land. Upon inquiry, the complainant told them that she alone held a key to that lock. Complainant admitted that she told the defendants the lake privileges she had "could be transferred to other parties, whoever purchased the place." True it is, the complainant also testified that this statement was made "after the agreement was signed." But, she had previously declared: "I really can't say when *Page 496 
it happened." Surely complainant's representation that her lake privileges "could be transferred" to "whoever purchased the place" referred to a future possible sale and to possible purchasers in general, not to a purchase by the defendants already agreed upon and evidenced by an executed contract. Unfortunately for her case, complainant's testimony is replete with contradictions and inconsistencies and, as to the most important issues, was uncorroborated.
Complainant is a widow, 68 years of age. She resided on the farm for 44 years, and knew that her husband had purchased it from his great-uncle who had owned it for an additional 30 years. She and her husband and their children, always freely made use of the lake for rowing, skating, fishing and bathing. Her husband ran a fence out into the lake and his cattle went there to drink; he took ice from the lake, and water to water his plants; he took humus from the lake bottom to enrich his soil; he cleared and sanded a bathing beach back of his home and anchored a platform at some distance from the shore; and, he was consulted by Mr. Silver before the latter, or his cottagers association, erected the fence about the beach, and the gate was placed therein for his use. Naturally, almost inevitably, the complainant came to feel that she had free use of the lake and, as she told the defendants, that she could transfer her privileges to a purchaser of her land.
While the evidence convinces me the complainant represented to the defendants that her land ran to, along and under some parts of the lake, it does not satisfy me she believed that to be true. It was proven that her land did not extend to the lake, and that the many courses of the boundary line nearest the lake were marked by permanent concrete and sandstone monuments. Complainant admitted knowledge of the concrete markers and of a survey made in about 1920, when they were erected. The sandstone markers were ancient. A surveyor's plan put in evidence clearly discloses the great number and the location of these monuments. Complainant's son-in-law revealed that he and complainant's attorney ran these courses before the defendants became interested in the property, probably at the time the "cyclone" *Page 497 
fence was erected by Mr. Silver or his cottagers' association. At any rate, Mr. Silver stated that the gate was placed in that fence by arrangement with complainant's solicitor. Complainant did not produce the deed by which her husband took title. She did produce a deed she took from her children. In that deed, and in the description of the land contained in her bill of complaint, it is observed that reference is twice made to a corner "near" the pond. In view of all these circumstances it is almost inconceivable that complainant did not know where her boundary line was located.
Complainant's testimony as to lake frontage and her representations with respect thereto, was most unsatisfactory. To illustrate: On direct examination, she vehemently and repeatedly denied that the subject of lake frontage and lake privileges was discussed by her with the defendants before execution of the contract. Yet, when asked on cross-examination about representations alleged to have been so made, she gave these answers: "I simply made the statement the north side of the farm ran up along the lake, * * *. Q. You said the north side of the farm ran along the lake? A. That is right." The court: "And does it for its full length of the north line?" The witness: "Yes." The court: "All the north line is along the lake?" The witness: "Yes." And another illustration: On cross-examination, complainant was asked about a telephone inquiry with respect to lake frontage, made by Stanley Goodwin, a director of the Wenonah Building and Loan Association, to which the defendants had applied for a mortgage loan. She replied: "I recall him calling, but I don't recall what he wanted to know, what information he wanted. Q. What did he say in that `phone conversation in February, 1947? A. I haven't the least idea." After Mr. Goodwin had testified that she told him her farm "absolutely" had lake frontage, she returned to the witness stand. Again asked about the telephone conversation, she said: "I remember since he testified yesterday that he did ask me about lake privileges * * *. Q. And didn't he ask you about lake frontage, and didn't you say you had lake frontage? A. I did not." Later, complainant conceded that, before the contract was executed, she told the defendants that her land "bordered *Page 498 
on the lake." Asked by the court how she came to make that statement, she answered: "He wanted to know just what the farm took in, it went back to the lake and west on Buck Road and on the south by the Clayton-Aura Road. Q. And bordered on the northeast by the lake? A. Yes, that is right."
At final hearing, complainant's solicitor offered to have the complainant convey to the defendants title by adverse possession to the strip of land between the actual boundary line and the water. Mr. Silver appeared herein as a witness, but he is not a party to the cause; he, or his cottagers, claim to own this land and to be ready to defend title thereto in court. Some effort was made to establish complainant's alleged adverse possession, but the proof was fragmentary, and inconclusive. The weight of the evidence would be persuasive that complainant does not have "marketable" title to the strip of land in dispute. The contract calls for such title. However, the question of adverse title should not and will not be determined in this cause where a known claimant is not a party. 55 Am. Jur., Vendor and Purchaser, §§168, 174 and 177.
It is the uniform rule in this State to decline to decree specific performance at the suit of a vendor of real estate where a reasonable doubt concerning his title exists, although that doubt is based on grounds merely debatable but which might visit litigation in that regard upon the purchaser, and although at law the title might in fact be declared good. Van Riper v.Wickersham (Court of Errors and Appeals), 77 N.J. Eq. 232;76 Atl. Rep. 1020; Saracino v. Kosower Construction Co.
(Court of Errors and Appeals), 102 N.J. Eq. 230;140 Atl. Rep. 458; 57 A.L.R. 1241.
Equity will not knowingly become an instrument of injustice, and where, as here, the case presented by the complainant is such that it would be unconscionable, and repugnant to a just sense of right as between man and man, to direct specific performance of the contract, the court will refuse its aid. A defendant "may be unable to prove any mistake, fraud or accident, in reference to its execution; and yet the conduct of the complainant may have induced such a state of things in relation to the subject-matter of the agreement as would make it not only proper, but the plain duty *Page 499 
of the court to refuse its aid in enforcing its specific performance." Stoutenburgh v. Tompkins, 9 N.J. Eq. 332, 336;Williams v. M.E. Blatt Co., supra.
For the reasons assigned, I must advise a dismissal of the complainant's bill.