Dixon Contracting Company, Inc., Petitioner *v.* Commonwealth of Pennsylvania, Department of Environmental Resources, Respondent.

Commonwealth of Pennsylvania, Department of Environmental Resources, Petitioner *v.* Dixon Contracting Company, Inc., Respondent.

Argued September 12, 1983, before Judges ROGERS, WILLIAMS, JR., and CRAIG, sitting as a panel of three.

*Richard C. Fox,* with him *Robert E. Chernicoff, Fox, Farr, Goldstein & Cunningham,* for petitioner/respondent, Dixon Contracting Company, Inc.

*Michael L. Harvey,* Deputy Attorney General, with him, *Allen C. Warshaw,* Deputy Attorney General, Chief, Special Litigation, and *LeRoy S. Zimmerman,* Attorney General, for respondent/petitioner, Department of Environmental Resources.

Opinion By Judge Williams, Jr., April 9, 1984:

The Commonwealth of Pennsylvania, Department of Environmental Resources (Commonwealth) and Dixon Contracting Company, Inc. (Dixon) each petition for review of a Board of Claims (Board) order which awarded Dixon the sum of $466,805.49 (with interest) for work performed under a contract between the parties to eliminate air pollution from an abandoned, burning culm bank.

In January 1971, after competitive bidding, the Commonwealth awarded Dixon a $4,500,000.00 contract (entitled "The Land and Water Conservation Reclamation Act, Air Pollution Project No. SL-210") for the control and elimination of air pollution resulting from an abandoned, burning coal refuse bank situate on private property in Schuylkill County. Mid-course in performance, the Commonwealth terminated the contract in September 1971, in order to have the job finished by another contractor at significantly lower cost. For the work it performed Dixon submitted invoices totalling $466,805.49 which the Commonwealth refused to pay.

On October 12, 1971, Dixon filed a Complaint with the Board alleging improper termination of the contract and requesting, *inter alia*, damages for work performed yet unpaid, a declaration that the termination was invalid and vague, nonspecified damages flowing from equipment rental expenses. Contending that the contract was illegal, hence void and unenforceable, the Commonwealth asserted a counterclaim of $203,175.00 seeking reimbursement of monies paid to Dixon under the contract.[1] After discovery and much procedural wrangling Board hearings finally commenced on Feb-

---

[1] The Board, by its order dated March 9, 1979, limited the Commonwealth's counterclaim to a set-off against Dixon's claim.

ruary 25, 1981. And, on that date, more than nine years after the filing of its original Complaint, Dixon sought leave to amend its pleading by requesting additional damages which included lost profits and consequential damages exceeding $2,500,000.00. Citing untimeliness and resultant prejudice to the Commonwealth, the Board refused Dixon permission to amend. By its opinion and order dated August 24, 1982, the Board awarded Dixon damages limited to monies due for work performed and, further, concluded that (1) the contract's award, issuance and execution were valid as a matter of law; (2) the Commonwealth capriciously and in bad faith terminated the contract; and (3) the Commonwealth was estopped from asserting the contract's purported illegality. Both the Commonwealth and Dixon appealed.[2]

Contract SL-210 provided for the extinguishing of a culm bank refuse fire on privately owned land. Monies for the project were appropriated under Section 20(a) of The Land and Water Conversation Act (Act)[3] for the purposes specified in clause (1) of Section 16 of the "Act." 32 P.S. §5116(a)(1). Section 16(a)(1), however, allocates funds "for the prevention, control and elimination of air pollution from abandoned burning coal refuse banks provided such land and bank material is [sic] *publicly owned . . . .*" (Emphasis added.) The Commonwealth argues that funds specifically appropriated for one purpose (*i.e.,* the extinguishment of culm bank fires on public property) cannot constitutionally be used for another purpose (*i.e.,* the extinguishment of culm bank fires on private property), and that contract SL-210, is therefore il-

---

[2] The Commonwealth challenges the award itself while Dixon questions the amount of damages included in the award.

[3] Act of January 19, 1968, P.L. (1976) 996, *as amended* 32 P.S. §5120(a).

legal, void and unenforceable.[4] *See* Article III, Section 24 of the Pennsylvania Constitution (prohibits payment of money out of the treasury except on appropriations made by law); *see also, Department of Public Welfare v. Harambee, Inc.*, 21 Pa. Commonwealth Ct. 430, 346 A.2d 594 (1975).

At the time the parties contracted, however, the Commonwealth interpreted Section 16(a)(1) of the Act to permit the filing of consent lines against private property (in lieu of public ownership of the realty through condemnation) as a condition precedent to the extinguishment of culm bank fires on private land. In accordance with that interpretation and practice, since abrogated by Official Attorney General Opinion No. 117 (1972), a consent lien was filed prior to Dixon's commencement of work. The Board concluded, inconsistently, that the consent lien procedure did not violate the Act *and* that the Commonwealth was equitably estopped from asserting the procedure's illegality.

It is axiomatic that while estoppel cannot validate a void contract, the doctrine may preclude an attack on a voidable contract. 17 Am. Jur. 2d, *Contracts* §7. A distinction exists, however, between an act completely outside a governmental entity's jurisdiction "and the

---

[4] The constitutional principle underlying the Commonwealth's argument was articulated by our Supreme Court in *Shapp v. Sloan*, 480 Pa. 449, 468-69, 391 A.2d 595, 604 (1978):

It is fundamental within Pennsylvania's tripartite system that the General Assembly enacts the legislation establishing those programs which the state provides for its citizens and appropriates the funds necessary for their operation. The executive branch implements the legislation by administering the programs: . . . It must do so within the requirements and restrictions of the relevant legislation . . . . The executive branch may not of its own initiative use funds appropriated for one program in carrying out another . . . . It is in this way that the doctrine of separation of powers functions. (Citation omitted.)

irregular exercise of a basic power under the legislative grant in matters not in themselves jurisdictional." *Summer Cottagers' Association v. City of Cape May,* 19 N.J. 493, 504, 117 A.2d 585, 590 (1955). "The former are *ultra vires* in the primary sense and void; the latter, *ultra vires* only in a secondary sense which does not preclude ratification or the application of the doctrine of estoppel in the interest of equity and essential justice." *Id.* at 504, 117 A.2d at 590-91.

Assuming, without deciding, that the consent lien procedure was invalid, the threshold inquiry is whether the Commonwealth's agreement with Dixon to extinguish a culm bank fire on private property is utterly beyond the Commonwealth's jurisdiction under the Act or merely an irregular exercise of contractual power within the purview of the statute. The Commonwealth, being empowered to spend funds appropriated for the elimination of air pollution from burning culm banks, acted within its legislative grant when it contracted with Dixon. And, if, in conducting its authorized purpose, the Commonwealth failed to comply absolutely with the Act, it should not be permitted to benefit by its own mistake to the detriment of an innocent party. *See Albright v. City of Shamokin,* 277 Pa. Superior Ct. 344, 419 A.2d 1176 (1980) (city estopped from refusing to pay retirement benefits, even though its retirement benefits ordinance failed to conform with enabling legislation).

Because the Commonwealth (1) originally interpreted Section 16 as authorizing the consent lien procedure, (2) awarded the contract to Dixon in accordance with that interpretation and (3) directed Dixon to execute the contract which Dixon partially performed, the Commonwealth is estopped from now asserting a position (*i.e.,* the "invalidity" of the consent lien procedure) inconsistent with its previous inter-

pretation and practice. *See Department of Revenue v. Family Hospital,* 105 Wis. 2d 250, 313 N.W.2d 828 (1982) (revenue department estopped from assessing sales tax on hospital's parking lot receipts when hospital failed to collect tax because it relied upon the department's memorandum stating that hospital parking receipts are nontaxable).

The Commonwealth next asserts that contract SL-210 is invalid and therefore unenforceable because the Secretary of the Department of Mines and Mineral Industries (DMMI)[5] signed the document without the approval, and against the wishes, of then Attorney General Fred Speaker. Before the Board, Mr. Speaker testified that upon uncovering suspected bidding irregularities in late 1970, he orally and indirectly (through the Governor's aide) advised then Governor Shafer not to sign contract SL-210. In a single, brief conversation which occurred in early January 1971, Mr. Speaker also advised the DMMI Secretary not to sign the document. Notwithstanding the Attorney General's efforts,[6] contract SL-210 was signed by the Governor, the DMMI Secretary and the Deputy Attorney General who approved the contract as to form and legality.[7]

Even assuming that the DMMI Secretary signed the contract in deliberate disregard of the Attorney

---

[5] The Department of Mines and Mineral Industries is the statutory predecessor to the Department of Environmental Resources.

[6] The Attorney General's "legal advice" in opposition to the contract consisted of a discussion with the Governor's aide and one, brief oral comment directed to the DMMI Secretary. The Board in Finding of Fact No 17 states:

> The Attorney General never issued any written memorandum or opinion advising against the award and execution of the Contract.

[7] Section 24 (entitled "Execution of Contract") of contract SL-210 provides in pertinent part:

General's oral disapproval, and that the Secretary was legally obligated to follow such advice under Section 512 of the Administrattive Code of 1929,[8] the Commonwealth is estopped from arguing the contract's "invalidity" because Dixon detrimentally reasonably relied on the authority of the Secretary to bind the Commonwealth contractually. See *Department of Revenue v. King Crown Corporation*, 52 Pa. Commonwealth Ct. 156, 415 A.2d 927 (1980).

Dixon asserts that the Board abused its discretion in refusing it leave to amend the pleadings (on the first day of trial) to include lost profits and consequential damages (including specific costs involving equipment rentals, equipment moving, bonding premiums and utility claims) more than nine years after the filing of the original complaint. In 1971, Dixon requested damages in the amount of $466,805.49, for work performed as represented by unpaid vouchers; in 1982, Dixon sought lost profits and specific consequential damages totalling more than $2,500,000.00. Concluding that the amendment request was untimely and, if granted, would prejudice the Commonwealth, the Board limited damages to work performed and denied leave to amend.

---

No proposal shall be considered binding upon the Commonwealth until the execution of the Contract and its approval as to form and legality by the Attorney General of the Commonwealth *or his representative.* (Emphasis added.)

The record is bereft of substantial competent evidence supportive of the Commonwealth's assertion in its brief that the Attorney General revoked the contract approval of his representative, Deputy Attorney General Robert Lesko.

[8] Act of April 9, 1929, P.L. 177, *as amended*, 71 P.S §192, repealed by Section 503 of the Commonwealth Attorneys Act, Act of October 15, 1980, P.L. 950, *as amended*, 71 P.S. §732-503. A similar provision is now found at Section 204(a) of the Commonwealth Attorneys Act, 71 P.S. §732-204(a)

In light of the extreme duration of the delay and the absence of any excuse, the Board properly denied Dixon leave to amend almost ten years after commencement of the action. *See W.T. Grant Company, Inc. v. United States Fidelity and Guaranty Insurance Company*, 279 Pa. Superior Ct. 591, 421 A.2d 357 (1980) (trial court properly refused insured's request to amend complaint to include a claim for interest more than four years after the complaint was filed). Further, the testimony of John P. Dixon, former president of Dixon, concerning the unavailability of business records which would accurately establish the measure of the additional damages, buttresses the Board's conclusion that permitting a late amendment would prejudice the Commonwealth. Because of the unexcused, extreme delay the Commonwealth is deprived of an opportunity to discover those now unavailable documents which are necessary to determine the accuracy of Dixon's additional damage claim.

Accordingly, we affirm.

### ORDER

AND Now, this 9th day of April, 1984, the order of the Board of Claims at Docket No. 266, dated August 24, 1982 is affirmed.