SUMMER COTTAGERS' ASSOCIATION OF CAPE MAY, NEW JERSEY, A CORPORATION OF THE STATE OF NEW JERSEY; C. WEBSTER ABBOTT, Jr., DOROTHY M. ABBOTT, JULIANA Y. BOAK, CROSBY N. BOYD, ELIZABETH U. BOYD, NORBERT J. BURKE, MARGUERITE L. BURKE, JAMES M. CLARK, Jr., LAURENCE V. COCHRANE, DOROTHY L. COCHRANE, ELIZABETH P. COLAHAN, JAMES K. DAVIS, ELLEN H. DAVIS, JOHN A. DIMOND, MARGUERITE M. DIMOND, JAMES B. DOUGLAS, HALLIE H. DOUGLAS, MABEL REED EDWARDS, H. A. EVERLING, E. K. EVERLING, BASIL M. GRAHAM, ELEANOR E. GRAHAM, THOMAS W. HARRIS, Jr., DOROTHY T. HARRIS, THOMAS HART, MARGARET N. HART, DAVID W. HOPKINS, ALICE CARNETT HOPKINS, JENNIE R. JAEGLE, EDGAR H. KIBLER, HELEN L. KIBLER, HENRY BURKE MATHEWS, KATHERINE G. MATHEWS, WILLIAM P. MEEKER, ELEANOR NICHOLS MEEKER, CHARLES F. MITCHELL, ALICE P. MITCHELL, ELIZABETH L. MONTGOMERY, JOHN R. MORROW, HAZEL R. MORROW, OLIVE L. NEWBOLD, MIRIAM G. OSBURN, CHRISTINE F. PORTER, GEORGE H. VOELKER, ELINOR M. VOELKER, GEORGE W. WAGNER, JOSEPHINE K. WAGNER, CHARLES H. WEBBER, JULIA W. WEBBER, EDWARD E. WHITE AND MARGUERITE M. WHITE, PLAINTIFFS-APPELLANTS, v. CITY OF CAPE MAY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY; SAMUEL F. ELDREDGE, SOL NEEDLES, Jr., AND CARL R. YOUNGBERG, COMMISSIONERS OF THE CITY OF CAPE MAY; OLIVER ELWELL, BUILDING INSPECTOR OF THE CITY OF CAPE MAY; ADOLPH M. KOCH AND EVELYN KOCH, HIS WIFE; LIONEL FRIEDBERG AND NAN FRIEDBERG, HIS WIFE; HESSEL FRIEDBERG AND ZIPPORAH FRIEDBERG, HIS WIFE; HARRY A. MANN AND BEATRICE MANN, HIS WIFE; HERBERT J. LUCHENBACH; AND BOARDWALK NATIONAL BANK, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS.

Argued September 19, 1955—Decided October 24, 1955.

494 

*Mr. Josiah E. DuBois, Jr.,* argued the cause for the appellants.

*Mr. William Elmer Brown* argued the cause for the respondent City of Cape May, Samuel F. Eldredge, Sol Needles, Jr., and Carl R. Youngberg, Commissioners of the City of Cape May, and Oliver Elwell, Building Inspector (*Messrs. Brown and Frank,* attorneys).

*Mr. Samuel Backer* argued the cause for the respondent Adolph M. Koch and Evelyn Koch, his wife, Lionel Friedberg and Nan Friedberg, his wife, Hessel Friedberg and Zipporah Friedberg, his wife, Harry A. Mann and Beatrice Mann, his wife (*Messrs. Backer and Arkus,* attorneys).

*Mr. Daniel Bell, Jr.,* argued the cause for the respondent Boardwalk National Bank of Atlantic City (*Messrs. Kirkman, Mulligan & Harris,* attorneys).

The opinion of the court was delivered by

HEHER, J.   By a civil action in lieu of *certiorari,* the plaintiff nonprofit corporation organized for the civic improvement and betterment of the Cape May community and 51 local taxpayers challenge the validity of the sale and conveyance by the local governing body to the defendants Adolph M. Koch and Evelyn, his wife, Lionel Friedberg and Nan, his wife, and Harry A. Mann and Beatrice, his wife, on May 1, 1953, of eight lots of land in the City of Cape May, numbered 5 to 12 inclusive on the city's tax map.   For want of compliance with *R. S.* 40:60–26, it is said, the purported conveyance is null and void; and, by the first count of the complaint, judgment to that end is prayed.   By a separate count, complainants sought the removal of an electric sign having a total area on three sides in excess of 50 square feet, placed on the roof of a motel erected on the lands so conveyed, as in violation of the local building zone ordinance and "detrimental to the neighborhood" and depreciative of property values.   It was made known on the oral argument that sometime during the course of the litigation the sign was demolished in a windstorm and had not been replaced.

There was judgment for defendants in the Law Division of the Superior Court, 34 *N. J. Super.* 67 (1954); and an appeal to the Appellate Division taken by the corporate plaintiff and 44 of the 51 individual plaintiffs is here for decision by certification on our own motion.

The sale was had under subdivision (a) of *R. S.* 40:60–26, as amended by *L.* 1948, *c.* 245, authorizing the governing body of a municipality to sell lands or buildings not needed

for public use "by public sale to the highest bidder after public advertisement thereof in a newspaper circulating" in the municipality "by two insertions at least once a week during two consecutive weeks, the last publication to be not more than seven days prior to the sale." Where the sale is to be public, the governing body may by resolution "fix a minimum price to be included in the advertisement of sale" and "public notice thereof given at the time of sale," or may by resolution provide that "upon the completion of the public sale, the highest bid made thereat shall be subject to acceptance or rejection by the governing body." There are alternative provisions for private sale on public notice and for a public or private sale on terms prescribed by resolution of the governing body, with the "approval in writing" of the director of the State Division of Local Government. Of this, more hereafter.

The contention is that (a) the "public were not given proper notice of the sale," and (b) the conditions of sale "combined with the circumstances surrounding it were such as to prevent a public sale of the lands to the highest bidder," and so the proceeding is utterly void and the doctrine of laches and estoppel has no application.

The Superior Court found that the deficiencies "are purely technical," not of such gravity as to render the sale void; that while the conditions of sale "gave Koch and his associates a competitive advantage," "they were not of such purpose as to prohibit and prevent any other person from bidding," and the sale cannot be adjudged void "since the defendants acted in good faith, have expended large sums of money, have incurred financial obligations," and, moreover, the sale "was not obtained by fraud, collusion or deceit," and plaintiffs have not moved with due diligence.

There were departures of substance from the prescribed procedure which vitiated the statutory policy of public notice and free competitive bidding.

The city's resolution of April 17, 1953 provided for a sale on May 1 to the highest bidder, bidding at least the fixed minimum price of $800 for the eight lots, on these "special

terms and conditions": "Building to start within 24 hours from date of sale, completion within 90 days"; the building "to contain at least 20 units such as efficiency apartment or hotel rooms," conforming "in every detail to plans filed at City Hall." The tax collector was directed to advertise the sale in the *Cape May Star and Wave* in its issues of April 23 and 30; and there was provision for the payment of the purchase price and the delivery of the deed "without general warranties" at the "conclusion of the bidding."

■ There was no notice of the proposed sale in the newspaper issue of April 23; and when the defendants Koch and Friedberg, who had been negotiating with the local governing body for the purchase of the lots as a site for a motel, indicated they would abandon the project unless the sale could be consummated at the time planned, it was decided to incorporate the advertisement of sale in a special edition of the newspaper. But, while the paper's regular edition of 2450 copies had a circulation of 1142 by mail to subscribers within and without the city, 900 to newsdealers, the remainder being retained for office sales, a reserve for replenishing dealers' supplies, advertisers' copies and file copies, the special edition had a mail circulation to regular subscribers and advertisers of not more than 100, and a distribution of less than 100 by newsstand sales. The remainder of "200 or more copies," said the editor of the paper in his affidavit, "were retained for current sales at the office, future retail sales and checking and file copies; a large number of copies were sold, leaving in our possession 25 copies." It is conceded that the omission of the sale notice from the regular issue of the paper was purely inadvertent; there is no substantial basis for the contrary assumption. The issue of April 30, the day before the sale, could not have given notice of the sale to the subscribers in major number, most of whom resided outside the city in April and did not receive their copies until after the sale was had. Plainly, the statutory direction for notice was not fulfilled.

And the conditions of sale made null the statutory policy of open competition. The draftsman apparently had in view

the situation of the respondents Koch and Friedberg and their avowed need for immediate action. They had had another Cape May site in prospect for the projected motel and, this having come to naught, they had a contractor and his facilities and a "crew of men" on hand ready to proceed with the construction work. And they were anxious to have the living units in use for the greater part of the summer, all this to reduce the ultimate cost. The plans on file were theirs, prepared by their own contractor, approved by the local governing body. No one else could have begun construction work within 24 hours, nine days after the time prescribed for the first public notice of the proposed sale, were he the successful bidder. It would be quite impossible to arrange for the requisite title examination, the construction work and the attendant financing within the brief period allotted. Koch and Friedberg began construction, the making of excavations and the pouring of concrete, on the very day of the sale, after their lone bid had been accepted. Their contractor had had the land surveyed and had done some preliminary work on the site even before the day of sale; the ground had been cleared by a bulldozer; wooden forms for the foundations had been put in place and concrete ordered. No one else could have entered the competition on equal terms with the successful bidders. Of this there can be no doubt. Indeed, competition was not expected. On April 24 Koch and Friedberg purchased an adjoining parcel of land, then in private ownership, for $2,000. This plot was needed for the consummation of the plan, for use as a parking area and for the construction identified on the filed plan as "future development." The lots now in question were not alone sufficient for the purpose.

But in all this there was no moral or conscious fraud. So much is conceded; good faith is acknowledged. The city had owned these lots for 20 years; title came through tax defaults. They had been unproductive and unsalable; and their return to the tax rolls would mean a revenue yield. And the improvements would make for community betterment. There had long been a need for "new buildings" and modern

hotel accommodations, of fireproof construction. The governing body suggests its judgment has been vindicated by the subsequent construction of four additional motels, affording the means of developing tourist trade and the promotion of communal prosperity and welfare, not to mention material additions to the tax rateables. Commissioner Youngberg affirms that these structures have enhanced the value of property in the neighborhood and stimulated the sale of land throughout the community.

In the circumstances, there was no reasonably foreseeable likelihood of competitive bidding for the lands. The object was not alone the realization of the value of vacant lands unneeded for public use, but a construction project that would also make for community growth and development. And molding the terms of sale to this end was within the local province. There is no contention *contra*. The statute, *R. S.* 40:60–26, empowers the governing body to "impose any restrictions on the use to be made" of the land to be sold "and any conditions of sale as to buildings or structures to be erected thereon, or as to the type, size, or other specifications of such buildings or structures, * * * and the time within which such conditions shall commence or be concluded, or any other conditions of sale in the manner and to the same extent as any other vendor of real estate, whether such sale shall be made at public or private sale; * * *."

There is no showing that any one else was ready to bid on the given terms or on any terms for that matter. There is no suggestion that the sale price was inadequate.

Yet, absent a corrupt motive or evil purpose, the nonobservance of the conditions thus annexed to the exercise of the power of sale would still constitute a fraud upon the statute in the legal sense, such as would warrant the vacation of the sale unless such relief be precluded by the principle of estoppel *in pais*.

Although the planned structure was a matter of common notoriety from the outset, plaintiffs refrained from both protest and action until the construction had been completed

at a cost of $100,000. The construction work began May 1, and was concluded in mid-July. There was no interruption of the work. Seven units were opened for occupancy July 3. The first remonstrance of plaintiffs came by registered letter mailed July 13. The complaint herein was filed July 27. Only the plaintiff Davis was sworn as a witness. But it was stipulated that his testimony "relative to notice or knowledge" should be binding upon all plaintiffs "to the same extent as though each of the other plaintiffs had like notice and knowledge."

Knowledge of the sale of the lots and of the actual commencement of the motel construction work came to Davis on May 4; and it was also on this day that the notice of the sale published in the local newspaper issue of April 30 was brought to his attention. He knew that two such published notices were required by law, but he could not find a prior publication. And he was aware of the conditions of sale. He consulted local owners of property, some of them plaintiffs in this action, two of whom were practitioners of the law; and he made further inquiry as to the sufficiency of the public notice of the sale. His co-plaintiff Clark had told him on May 4 that "in his opinion a motel was prohibited by the zoning law in that area"; and on May 7 there was discussion of a proceeding to enjoin the construction of the motel "as being against the zoning law." But nothing was done until July 5 when, Davis said, "six or seven of us," including an attorney practicing in Washington, D. C. and plaintiffs' counsel in this action, met to discuss action "about the sign to be—being erected on top of the motel," and decided that "a protest would be lodged at the Commissioners' meeting" to be held the following day.

"Numerous people" attended the meeting of the governing body, Davis said, "and voiced their objection to the sign and requested the Commissioners to have it removed as a violation of the zoning law." And it was also decided that "there should be a more thorough investigation to ascertain all the facts, if possible, relating to the sale of the lands," and Davis was delegated to go "to the Court House and see what

could be learned relating to the sale." There was an inquiry to that end; and at a meeting of the directors of the Summer Cottagers' Association held July 12, attended by plaintiffs' attorney in the current proceeding, it was determined to make demand upon the governing body and the owners of the motel for the "removal of the electric sign," and to bring action. Letters to that effect were dispatched the following day to the governing body, the defendant purchasers of the lands, and the mortgagee (the first notice to come to defendants of an objection to the sale of the lands) advising that unless the "large electric sign" was removed within a week, a taxpayers' suit to that end would be brought, and "In this same action, or in a separate action," a "review of the sale of the lands" would be sought. It was the electric sign that galvanized plaintiffs into action.

In a letter to Clark on May 19, Davis enclosed a copy of *R. S.* 40:60–26. On a visit to the *locus* on June 26, Davis found the motel "in a large state of completion"; and he observed that the motel was opened for business, "roughly, July 1"; it was "opened in sections," and "the rooms were opened as they were completed." And he "stayed at the motel." It was shown that certain of the plaintiffs knew the motel was in process of construction as early as May 1 and May 3. The plaintiff Clark saw a surveyor on the land on April 25, or so, and learned from him that a motel was to be erected. And he observed the pouring of concrete footings on May 1.

The principle of estoppel *in pais* is not, for obvious reasons, given the same freedom of application against the public as against private persons. Municipalities, for example, are agencies of government for local administration with enumerated powers, and deviations from the legislative grant must needs have the legal consequences comporting with the declared legislative intention and policy. The essential principle of the policy of estoppel here invoked is that one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon

such conduct. Compare *Demarest v. Den ex dem. Hopper*, 22 *N. J. L.* 599 (*E. & A.* 1850); *Central R. R. Co. of New Jersey v. MacCartney*, 68 *N. J. L.* 165 (*Sup. Ct.* 1902). An estoppel by matter *in pais* may arise by silence or omission where one is under a duty to speak or act. *Mason v. Dulaney*, 144 *Md.* 108, 124 *A.* 390 (*Ct. App.* 1923); *Mangusi v. Vigilotti*, 104 *Conn.* 281, 132 *A.* 464 (*Sup. Ct. Err.* 1926). It has to do with the inducement of conduct to action or nonaction. One's act or acceptance may close his mouth to allege or prove the truth. *Doerstler v. First National Bank*, 82 *Or.* 92, 161 *P.* 386 (*Sup. Ct.* 1916). The doing or forbearing to do an act induced by the conduct of another may work an estoppel to avoid wrong or injury ensuing from reasonable reliance upon such conduct. The repudiation of one's act done or position assumed is not permissible where that course would work injustice to another who, having the right to do so, has relied thereon. *New Jersey Suburban Water Co. v. Harrison*, 122 *N. J. L.* 189 (*E. & A.* 1939). An estoppel arises "where a man is concluded and forbidden by law to speak against his own act or deed; yea, even though it is to say the truth." *Termes de la Ley*, title *Estoppel*.

There is a distinction between an act utterly beyond the jurisdiction of a municipal corporation and the irregular exercise of a basic power under the legislative grant in matters not in themselves jurisdictional. The former are *ultra vires* in the primary sense and void; the latter, *ultra vires* only in a secondary sense which does not preclude ratification or the application of the doctrine of estoppel in the interest of equity and essential justice. Compare *Jersey City Supply Co. v. Jersey City*, 71 *N. J. L.* 631 (*E. & A.* 1905); *Los Angeles Dredging Co. v. City of Long Beach*, 210 *Cal.* 348, 291 *P.* 839 (*Sup. Ct.* 1930), 71 *A. L. R.* 161; *Continental Construction Co. v. City of Lawrence*, 297 *Mass.* 513, 9 *N. E. 2d* 550 (*Sup. Jud. Ct.* 1937), 111 *A. L. R.* 699; *Town of Holbrook v. Girand*, 52 *Ariz.* 291, 80 *P. 2d* 695 (*Sup. Ct.* 1938), 118 *A. L. R.* 1203; *State ex rel. Bayer v. Funk*, 105 *Or.* 134, 199 *P.* 592, 209 *P.* 113 (*Sup. Ct.* 1922), 25 *A. L. R.* 625; *Bell v. Kirkland*, 102 *Minn.* 213, 113 *N. W.*

271, 13 *L. R. A., N. S.,* 793 (*Sup. Ct.* 1907). But there cannot be such relaxation of the conditions laid down in the grant of the power as to defeat the public policy intended to be served. The question is essentially one of legislative intention. Are the conditions made prerequisite to the very existence of the power—a limitation of the power itself?

In *Bauer v. City of Newark,* 7 *N. J.* 426 (1951), we noted the distinction between an utterly void contractual undertaking for want of municipal capacity no matter what the circumstances and a contract within the general powers of the municipality but void and unenforceable for lack of an appropriation, or for nonconformance with a statutory condition precedent, "as distinguished from an *intra vires* contract merely voidable for want of authority or for an irregularity in the exercise of the contractual power"; and the holding was that the purported contract was rendered null and void by the statute, and could be adopted or ratified only by full compliance with the statutory prerequisites to contractual liability in the first instance; the law would not imply a promise to pay when that course would flout an explicit statutory mandate; and, by the same token, there could be no recovery on a *quantum meruit.* The ruling consideration there was that the statutory policy may not be set at naught by indirection.

In *Hudson City Contracting Co. v. Jersey City Incinerator Authority,* 17 *N. J.* 297 (1955), sustaining a recovery in an action on a *quantum meruit* where a supposed express municipal contract was unenforceable, we held, in an opinion by Mr. Justice Burling, that "where the power to contract lies within the competence of the municipal corporation and there has been an irregular exercise of that power in good faith, recovery on the *quantum meruit* may be had although the express contract is void," but the recovery there was limited to the "reasonable expense" of the "performance of services actually rendered," in "good faith," "not in excess of * * * actual expenses, and deleting profits."

While it was the original rule that a contract *ultra vires* was void *ab initio* and could not be validated by performance

or by the application of the law of estoppel, the rights of persons innocently entering into *ultra vires* contracts with private corporations came to be recognized in the refusal to apply the doctrine, when invoked for or against a corporation, "where it would defeat the ends of justice or work a legal wrong." *Ohio & Mississippi Railway Company v. McCarthy,* 96 *U. S.* 258, 24 *L. Ed.* 693 (1878). See also Mitchell, J., in *Minnesota Thresher Mfg. Co. v. Langdon,* 44 *Minn.* 37, 46 *N. W.* 310 (*Sup. Ct.* 1890). But the opposing public policy cannot be disregarded. The limitations of the power are presumed to be commonly known.

▓▓ Here, the power of sale was within the municipality's essential jurisdiction. The lands were taken by foreclosure of municipal tax liens, and so were held by the local corporation in its private as distinguished from its governmental capacity. See *Essex County Park Commission v. State Board of Tax Appeals,* 129 *N. J. L.* 336 (*Sup. Ct.* 1943). The enabling statute, *R. S.* 40:60–26, as amended, conferred the power to sell lands unneeded for public use by alternative methods, conditioned to safeguard the public interest, depending upon whether the sale was public or private. *E. g.,* a private sale could be had by ordinance under a mode of procedure insuring competitive bidding after public notice or upon "such terms and conditions as shall be authorized by resolution" of the governing body, approved by the director of the State Division of Local Government, save that in the case of a veteran of World War II, the approval of the director shall not be required.

▓▓ And there is in the particular circumstances a preclusion in equity and elemental justice against the relief demanded by plaintiffs. Interposing no challenge to the adequacy of the price paid for the lots, they would now vacate the sale after the erection of a structure of great value, a project known to them at the outset which in its very nature called for timely action lest the landowners be misled to their injury by the reasonable implications of nonaction.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*For reversal*—None.