VINCENT L. GALVANO, PETITIONER–APPELLANT, v. BOARD OF TRUSTEES OF THE PUBLIC EMPLOYEES' RETIREMENT SYSTEM, RESPONDENT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted May 3, 1988—Decided June 1, 1988.

---

[15]In *Fischer v. Johns–Manville Corp.,* 103 *N.J.* 643, 654 (1986), the Court cited *O'Brien v. Muskin Corp., supra,* 94 *N.J.* at 181–184, for the proposition that the "risk-utility analysis to evaluate [a] product's safety is sometimes phrased to inquire whether [a] reasonable manufacturer, fully aware of [the] dangers posed by [the] product [as designed], would have manufactured and marketed it as he did."

Before Judges DEIGHAN, R.S. COHEN and LANDAU.

*Dato & Carracino,* attorneys for appellant (*Robert F. Dato,* of counsel and on the brief).

*W. Cary Edwards,* Attorney General, attorney for respondent (*Michael R. Clancy,* Deputy Attorney General, of counsel; *Kathe F. Mullally,* Deputy Attorney General, on the brief).

The opinion of the court was delivered by

LANDAU, J.A.D.

This is an appeal by Vincent L. Galvano (Galvano) from a final determination of the Board of Trustees of the Public

Employees' Retirement System (Board) denying his application for veteran's retirement benefits under *N.J.S.A.* 43:15A–61(b).

Galvano, a Township of Woodbridge truck driver, applied for veteran's retirement on July 24, 1984 (filed August 13, 1984) to be effective on October 1, 1984. On September 19, 1984, the Board approved his application for veteran's retirement as requested. However, on October 15, 1984, the Division of Pensions notified Galvano, who was then 61 years old, that he was ineligible for veteran's retirement because he had not attained his 62nd year as of October 1, 1984. The record does not disclose that the Board participated in this administrative modification of its action. Galvano was advised in that letter that his retirement was instead being processed as a "service" retirement. No other alternatives were communicated to him. He was also informed of the monthly amounts which would be payable under a service retirement, depending upon the option selected. Galvano selected one of the options, checking the box marked "veteran" in the form section which inquired as to the type of pension involved.

In order to change his option selection, Galvano filed again, specifically for veteran's retirement benefits effective October 1, 1984. The application was processed as a service retirement and affirmed as such by the Board, without reference to its earlier approval of veteran's retirement, and without rejection of the request for veteran's retirement benefits.

It is not disputed that if Galvano had been actively employed by Woodbridge until June 5, 1985, his veteran's status and years of employment would have qualified him for a veteran's pension on his 62nd birthday, thus providing pension benefits substantially higher than those paid for the ordinary service retirement he now receives.

Galvano's attorney asked in 1985 that he be permitted to "reverse the mistake that Mr. Galvano made when he accepted option two of the service retirement benefits" in order to seek veteran's benefits as of June 5, 1985, Galvano's 62nd birthday.

The attorney urged that Galvano "... really had no intention to seek service retirement benefits ..." when he applied for veteran's retirement benefits in 1984.

The chief of the bureau of retirement replied to the attorney's letter, essentially saying that inasmuch as Galvano was short of attaining age 62 when his retirement became effective the Board could not "cancel the retirement once it has been processed." In response to a further letter, the Board's secretary formally denied the request for veteran's retirement benefits, because of failure to comply with *N.J.S.A.* 43:15A–61(b), and advised as to appeal rights, leading to the proceedings and decision under review.

During hearings before an Administrative Law Judge (ALJ), Galvano asserted, without contradiction or objection, that he had been told by the mayor of Woodbridge and by his garage supervisor that he could continue working, if he desired, doing light duties as a watchman in the garage. Specifically, he said "I had the option of going back. I was told by DeMarino and Jud Dello and Wally Bowen, being I had so many years of service, they will carry me, they will put me back to work. If I would have known eight months was involved, I would have ran back to the garage. I would be a fool to retire at 400 when I could go to 800."

Galvano also stated that as a matter of routine, he could have made application for two six month leaves of absence which would have been granted. He testified "I go before the town council and I apply for six months leave of absence, they okay it. I have never yet heard of a case where they deny it. You are on the books but not collecting no pay, you go for six months. Should you need another six months, you reapply to the town council, they okay it. After the twelve month, that's it. You either go back on the payroll ... or you resign ... That's it."

Galvano also testified that he was told by Woodbridge officials that he could retire with veteran's benefits and that,

coupled with the letter of approval he received from the Board on his veteran's benefit application, he was misled to his detriment. He indicated that as an unsophisticated person, he assumed that references in later correspondence to "service" benefits referred to his military service, and that he did not realize anything was amiss until he received the first retirement check. This, notwithstanding the language of the October 1984 letter from the Division of Pensions which specifically set forth monthly amounts to which he would be entitled under the various service retirement options.

In later correspondence, the Division also took the position that once Galvano's retirement became effective as of October 1, 1984, it could not be "cancelled."[1] Thus, it appears that, if Galvano did indeed have the option of returning to light duties as he stated, and if he relied upon the pre-October 1, 1984 notification that his veteran's benefit retirement had been approved, he would have been severely prejudiced by the Division's delay in revoking this approval until after the effective date of his retirement.

We note that at the time of his initial application, Galvano had exhausted his substantial accumulated sick leave and vacation accruals, and had also run through his State disability benefits, following a severe heart attack in 1983. Although Galvano suffered a second attack in 1984, he said he could perform light duties.

The Administrative Law Judge concluded that circumstances warranted an award of veteran's benefits on a theory of equitable estoppel, because Galvano relied to his detriment upon the initial approval of his application for veteran's benefits by advising his employer of his retirement as of October 1, 1984,

---

[1]The record discloses that the form "Notice of Retirement Approval" carries the following warning memo: "IF YOU RETURN TO PUBLIC EMPLOYMENT FOLLOWING YOUR RETIREMENT, YOU MUST NOTIFY THIS OFFICE IMMEDIATELY."

resulting in his preclusion from exercising an option to return to work until he attained age 62.

The Administrative Law Judge also made a specific finding that Galvano's testimony respecting his ability to return to light work or secure a leave of absence was credible. He also found that when Galvano received notice of approval of his veteran's pension, he was convinced he could legally retire at one-half pay as a veteran and so told the township that he would retire October 1, 1984 and was in consequence "removed from the township payroll."

The final administrative determination of the Board rejected the ALJ's recommendation and affirmed its original denial of Galvano's request for veteran retirement benefits. Specifically, the Board differed with the ALJ's reliance on the doctrine of equitable estoppel, and his finding that there was no showing of significant adverse impact upon the fiscal integrity of the Pension Fund. The Board concluded that Galvano's position had not substantially changed by reason of the initial mistaken approval of his veteran's benefit request, and that the prospect of his return to work or leave of absence was pure speculation. It also concluded that the difference in monthly pension amounts between service and veteran's retirement inherently demonstrated an impact upon the fiscal integrity of the system.

The Board adopted the legal recommendations of the Administrative Law Judge that it did not have power to waive the age 62 requirement of *N.J.S.A.* 43:15A–61(b), and that the doctrine of substantial compliance set forth in *Bernstein v. Bd. of Trust., Teachers' Pen. & Ann.*, 151 *N.J.Super.* 71 (App.Div. 1977) was not applicable. We think that the ALJ and the Board correctly considered the waiver and substantial compliance issues, substantially for the reasons stated in their respective opinions.

As to the Board's rejection of the argument generally characterized as one of "equitable estoppel," we are not similarly satisfied.

We begin our consideration by recognizing that there is a historic reluctance to apply equitable principles of estoppel to governmental actions. We must be particularly cognizant of this where the agency is acting in a fiduciary capacity to administer and conserve pension funds for the benefit of thousands of public employees. *See, Zigmont v. Teachers' Pension, Etc. Fund Trustees,* 91 *N.J.* 580, 583 (1983). That fiduciary responsibility however, also extends to Vincent Galvano.

In its evaluation of the equitable estoppel argument, the Board placed high reliance on the fact that Galvano would not turn 62 until June 1985. Galvano, it says, was not eligible for veteran's retirement benefits when he made the application which was approved, and consequently could not have compelled the Board to grant him such benefits in October 1984, because he did not have the "right to do so" at the time he relied. *See, Summer Cottager's Ass'n of Cape May v. City of Cape May,* 19 *N.J.* 493, 504 (1955). However, this concept received further amplification in *Skulski v. Nolan,* 68 *N.J.* 179 (1975), where the Supreme Court reviewed the reconsideration by pension authorities of many pensions allegedly improperly granted. The Court concluded that equitable factors must enter into the equation even in circumstances where the pensions were improper. Factors such as foreclosure of opportunity to seek other employment and reliance were therefore considered.

Needless to say, *Skulski* is anything but a blank check. The Court specifically took notice of the "general policy considerations against dissipation of public funds through unauthorized pension grants" and we are well aware of this policy. It also noted, however, that where pension board actions caused pensioners to forego other opportunities which may otherwise have been available to them, the Court had to consider that "the course of events cannot be rerun." *Skulski v. Nolan, supra,* 68 *N.J.* at 197. The Court recognized the distinction drawn in *Summer Cottager's* "between an act utterly beyond the jurisdiction of a municipal corporation and the irregular exercise of

a basic power under the legislative grant in matters not in themselves jurisdictional." *Id.* at 198. It concluded that where the pension grants were not beyond the jurisdiction of the body granting them, as distinct from being improperly exercised, it was appropriate for the Court to weigh equitable considerations, particularly the reliance factor, when determining whether to reopen a given pension award. *Id.* at 198–199.

We believe that the Board incorrectly applied *Summer Cottager's* to the present case, by failing to recognize that this process really began when the Board granted Galvano's application for veteran's retirement.

As we view the facts, the October 15, 1984 letter was an administrative staff revocation of the September Board decision which had approved veteran's pension benefits for Galvano. The Board clearly had jurisdiction to approve that pension request, although its approval was incorrectly exercised in light of the age 62 requirement of *N.J.S.A.* 43:15A–61(b). The Board's inherent power to correct its mistake was subject, however, to the equitable considerations spelled out in *Skulski.*

Important, too, in this equitable policy equation is the abundance of authority which has declared that pensions for public employees serve an important public purpose by inducing able persons to enter and remain in public employment. Deemed remedial in character, statutes creating pensions should be liberally construed and administered in favor of the persons intended to be benefitted thereby. *See, Bernstein v. Bd. of Trust., Teachers' Pen. & Ann., supra,* 91 *N.J.* at 76, and authorities there cited. Added to this must be the legislative recognition of the debt society owes to its veterans of armed conflict by affording to them special benefits when they statutorily qualify.

Although this case is presented as an appeal from the Board's refusal to reconsider Galvano's service retirement to permit veteran's retirement at age 62, we cannot ignore the fact that it was precipitated by the unilateral reconsideration

and recasting of the Board's September 1984 approval of Galvano's application for veteran's benefits by the Division (not the Board) in October 1984, without affording notice of its rejection by the Board and without setting forth alternatives to Galvano.

As previously observed, the Division of Pensions advised Galvano that, as it administers pensions, a retirement cannot be cancelled once approved. Thus, although the language of the court cases which we have cited suggests that the Board and Division of Pensions have a fiduciary duty to administer statutes favorably to the persons intended to be benefitted thereby, Galvano was effectively precluded from opportunity to seek to arrange additional public employment until he attained age 62. This preclusion occurred because the effective date of his retirement (October 1, 1984) had already passed when Galvano was advised by the Division that his veteran's retirement application had been treated instead as a service retirement. By that time, under the Division's interpretation that there could be no reopening after retirement, it would have been too late for Galvano even to try to secure eligibility for the veteran's pension through further employment. We think this result was incorrect, arbitrary, inequitable and out of keeping with the clear charge that Title 43 be administered to benefit pensioners as well as to preserve fiscal integrity.

Galvano's very loss of opportunity was itself prejudicial. Moreover, the Board incorrectly determined that the testimony respecting his ability to return to light duties was only speculation. In fact, Galvano specifically identified by name the mayor and the other officials who told him that a light duty job would be available. Although Galvano was vague as to the dates when these representations were made, it was certainly not inherently incredible that a 61 year old employee with 21 years of service would be favorably considered for return to lighter duties for a period of eight months or less after suffering two heart attacks. The record discloses no rebuttal of Galvano's testimony in this regard.

We ascribe no particular significance to Galvano's testimony that he could also have received a leave of absence carrying over to his 62nd birthday, had he not been misled. The Attorney General ruled in 1966 with considerable statutory and case authority that a veteran must be in compensated active service at age 62 in order to qualify for the special veteran's half pay retirement benefit, and that this would not include members on approved leave of absence without pay. Op. Att'y Gen., No. 2, at 116 (1966). This reported interpretation has not been modified by the Legislature or the courts in over 20 years, and we see no reason to do so.

We hold that when the Division of Pensions recognized the error made by the Board in September 1984 it should have notified both the Board and Galvano, and afforded an opportunity for Galvano to decide whether he wished his veteran's retirement benefit application to be treated as a service retirement.[2]

Consistent with its duties, the Division should also have informed Galvano that if in active compensated employment on his 62nd birthday, he would be eligible for veteran's benefits. It would also have been appropriate to explain the differences between veteran and service retirement benefits, so that a rational choice could be made. Because Galvano was denied such fundamental information and timely opportunity to decide his own retirement fate, we believe that he was treated arbitrarily in 1984, and that the Board failed to recognize this when considering his request for correction to veteran's status. Galvano was deprived of the chance to seek reinstatement to

---

[2] We note that *N.J.A.C.* 17:2–6.2 provides that a member has the right to withdraw, cancel or change an application at any time before his retirement allowance becomes due and payable and that "... thereafter the retirement shall stand *as approved by the board.*" (Emphasis supplied) The Board did not approve a service retirement until November 1984, when Galvano changed his option on forms provided by the Division. Even then, he requested a veteran's retirement and they did not reject it, but approved a service retirement which he did not request.

compensated employment before he was service retired, because he was not told in time of the change in the Board's decision, nor adequately informed of his alternatives. This was not a relationship between arms-length business peers.

These factors, taken together with the Board's misreading of *Summer Cottager's* prompt us to reverse and remand. However, although there was uncontested proof that Galvano was told by named superiors that he could be reinstated on light duty, there was no indication of the salary at which such employment would have been afforded. Neither was it clear when this information was imparted.

While we disagree with the Board's characterization that the evidence was purely speculative, we recognize its inadequacy to establish more than the fact that the loss of opportunity for employment could have been meaningful. Further, as pension benefits are based upon the last full year of compensation, it cannot be assumed that Galvano's compensation as a truck driver in 1983 would be the same for light duty employment in 1985. Neither has it been established that there was available light duty employment, specifically at the time of Galvano's attainment of age 62 in June 1985. We accordingly remand to the P.E.R.S. Board with direction that Galvano be afforded opportunity to establish those facts by direct proof. If so established, a veteran's pension consistent with those facts should be afforded. If the availability of such a job and its compensation are not satisfactorily established no veteran's pension shall be granted.

We add that we do not foreclose the possibility that Galvano could still be reemployed by Woodbridge even at this late date. Should that occur and his present pension benefits cease, we see no reason why Galvano, having attained age 62 and accumulated the requisite 20 years of public employment could not again apply for veteran's retirement.

Finally, as the issues of waiver and substantial compliance have been resolved, we fail to see any further significance of

the question of fiscal impact upon the pension fund. If Galvano is entitled to a veteran's pension under this opinion, after the remanded issues are resolved, then he should receive it, just as any qualified veteran.

Reversed and remanded for proceedings consistent herewith.

TOWNSHIP OF WARREN, PLAINTIFF–RESPONDENT AND CROSS–APPELLANT, v. MARION R. SUFFNESS, CHARLES G. & BARBARA A. SAVINI, AND WILLIAM L. & NANCY A. SMITH, DEFENDANTS–APPELLANTS, AND CROSS–RESPONDENTS.