925 A.2d 88 (2007)
394 N.J. Super. 55
In the Matter of the ESTATE OF Edward H. SHINN, IV, deceased.
Stacey Shinn, Individually, Plaintiff-Appellant, and
Stacey Shinn, as Guardian Ad Litem of the Infant, Samantha Shinn, Plaintiff,
v.
Bonnie Schaal, as Guardian Ad Litem of the infant, Jodi Shinn, Edward V. Shinn, V, Individually, Courtney Shinn, Individually, and Stephen Shinn, Executor and Trustee for the Estate of Edward Shinn, IV, Defendants-Respondents, and
Bonnie Schall, Individually, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued May 9, 2007.
Decided June 20, 2007.
*89 Francis G. Grather, Morristown, argued the cause for appellant (The Margolis Law Firm and Broderick, Newmark & Grather, attorneys; Martin G. Margolis and Mr. Grather, on the brief).
Barbara Strapp Nelson, Lawrenceville, argued the cause for respondent Bonnie Schaal, as guardian ad litem for Jodi Shinn, and respondents Courtney Shinn and Edward Shinn, V (Stark & Stark, attorneys; Ms. Nelson, of counsel and on the brief).
Steven Pontell, Fort Lee, argued the cause for respondent Stephen Shinn, Executor and Trustee for the Estate of Edward Shinn, IV (Herold & Haines and Verde, Steinberg & Pontell, attorneys; Mr. Pontell, Martine Pierre-Paul and John Loalbo, of counsel and on the brief).
Before Judges PARKER, C.S. FISHER and YANNOTTI.
The opinion of the court was delivered by
FISHER, J.A.D.
In this appeal, we consider, among other things, whether the trial judge properly invoked the doctrine of equitable estoppel *90 in order to enforce plaintiff Stacey Shinn's premarital waiver of an elective share to the estate of her late husband, Edward Shinn, IV, which, in the circumstances, was otherwise rendered unenforceable by N.J.S.A. 3B:8-10 and N.J.S.A. 37:2-38. Because "equity follows the law," the doctrine of equitable estoppel should not have been utilized to override the Legislature's declaration that a premarital agreement, which did not fully disclose what was being waived or which did not contain an adequate waiver of such a disclosure, must not be enforced.

I
Stacey and Edward met in August 1991 and, by September 1992, began living together in Edward's rented townhouse. In August 1994, Edward purchased a home in Rockaway, where they thereafter resided together.
Stacey and Edward became engaged in December 1994, and agreed to a small wedding in Hawaii in August 1995. Approximately one month before the wedding, Stacey planned to visit her mother and sister in Florida. The night before this trip, Edward presented Stacey with a draft of an agreement prepared by his attorney.[1]
The agreement included, among other things, a waiver of Stacey's right to an elective share of Edward's estate. It also purported to limit Stacey's right to equitable distribution if she and Edward divorced, entitling her only to $3,000 multiplied by the number of years the parties were married prior to the dissolution of the marriage if dissolution occurred on or before their tenth wedding anniversary, and $5,000 multiplied by the number of years the parties were married if dissolution occurred after their tenth wedding anniversary.[2] In addition, the agreement contained limits on Stacey's right to alimony upon a dissolution of the marriage.[3] Edward also agreed that in the event of his death, Stacey would be entitled to receive a death benefit of $100,000.
Stacey left for Florida the day after receiving a copy of the agreement. She conversed with a New Jersey attorney about the agreement while in Florida. Stacey's attorney, Alan Rich, Esq., then contacted Edward's attorney, Edward Rosen, Esq., and, on July 17, 1995, Rosen forwarded to Rich a copy of the agreement.
Following his review of the agreement, Rich requested that Rosen provide the financial information that was referenced, but not included, within the agreement; Rosen immediately sent to Rich a copy of a document entitled "Financial Statement of Edward H. Shinn, IV, as of July 18, *91 1995," and advised Rich to append this document, as Rider A, to the agreement.
The financial statement revealed Edward's ownership of: a certificate of deposit (in the amount of $20,000); 100% of the stock in Edward Shinn United Crane, Inc. (valued at $635,000); 50% of the stock in Shinn Brothers Associates Inc. (valued at $80,000); 50% of the stock in Shinn Brothers Properties Inc. (valued at $6,750); a loan receivable due from Shinn Brothers Properties Inc. (in the amount of $52,000); 1.83% ownership of commercial rental properties referred to as Kenilworth Properties (the value of which was described on the document as "not available"); 6.66% ownership of commercial rental properties referred to as Lakewood Properties (the value of which was described as "not available"); 6% of the stock in United Crane & Shovel Service Co. Inc. (the value of which was described as "not available"); and the Rockaway residence (the equity of which was valued at $60,000 based upon an original purchase price of $290,000 and an outstanding mortgage of $230,000).
The financial statement did not disclose: Edward's earnings (of approximately $300,000 per year); his financial obligations relating to his purchase of the entity later known as Edward Shinn United Crane, Inc.; an annuity of $95,022.32; and a pension payable to Edward at age 55 of $892.76 per month and at age 60 of $1,539.65 per month. And, as already mentioned, the financial statement failed to attribute a value to Kenilworth Properties, Lakewood Properties, or United Crane & Shovel Service Co., Inc. As a result of these omissions, the figures provided by the financial statement indicated that Edward had a net worth of only $853,750. Contrary to this representation, it was revealed at trial that in applying for life insurance in 1992 and again in 1995, Edward represented his net worth to be in excess of $6,000,000.
On July 25, 1995, Rich expressed to Rosen that there were problems with the agreement, including the lack of a complete statement of Edward's financial condition. Rosen responded that Stacey and Rich had already received all the information they were going to get.
On July 26, 1995, Rich met with Stacey. He attempted to negotiate changes in the agreement and obtain additional financial information, but Rosen reiterated Edward's intractable position and advised that Stacey would have to sign the agreement as is or the marriage was off. When this response and Rich's advice that she not sign the agreement was relayed, Stacey left Rich's office in tears. She called Edward a few minutes later, and pleaded for him to give Rich additional information as well as his consent to the changes in the agreement that Rich sought. Edward summarily refused, saying that Stacey "had to sign it the way it was or [they] weren't getting married." This further upset her, but Stacey returned to Rich's office and signed the agreement.[4]
Stacey and Edward married in Hawaii on August 16, 1995. On May 17, 1996, Stacey gave birth to Samantha.
Following Samantha's birth, Edward and Stacey went to Rosen's office to sign wills. Edward's will directed, among other things, that upon his death Stacey would receive the Rockaway home, and that his estate would pay off the mortgage on that property. The remainder of Edward's estate was to be split equally between all *92 four of his children and held in trust until they reached the age of thirty.[5]
After a short illness, Edward died on May 19, 1998 at the age of 46.
A few months later, Stacey commenced this action on her own behalf and as guardian ad litem for Samantha, seeking, among other things, a judgment that would both declare the premarital agreement unenforceable and recognize Stacey's right to receive her elective share of Edward's estate.

II
N.J.S.A. 3B:8-1 permits a surviving spouse to elect a right to take one-third of the augmented estate of a deceased spouse. That specific right, however, may be waived, in whole or in part, by written agreement. Specifically, N.J.S.A. 3B:8-10 expresses the Legislature's intent that an elective share may be waived "by a written contract, agreement or waiver, signed by the party waiving after fair disclosure" (emphasis added).
Subsequently, in 1988, the Uniform Premarital Agreement Act, was enacted in this State, N.J.S.A. 37:2-31 to -41. This act defines more thoroughly than N.J.S.A. 3B:8-10 when a premarital agreement may be enforced, and it also governs all types of premarital agreements, not just those that contain a waiver of an elective share:
The burden of proof to set aside a premarital or pre-civil union agreement shall be upon the party alleging the agreement to be unenforceable. A premarital or pre-civil union agreement shall not be enforceable if the party seeking to set aside the agreement proves, by clear and convincing evidence, that:
a. The party executed the agreement involuntarily; or
b. The agreement was unconscionable at the time enforcement was sought; or
c. That party, before execution of the agreement:
(1) Was not provided full and fair disclosure of the earnings, property and financial obligations of the other party;
(2) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided;
(3) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party; or
(4) Did not consult with independent legal counsel and did not voluntarily and expressly waive, in writing, the opportunity to consult with independent legal counsel.
d. The issue of unconscionability of a premarital or pre-civil union agreement shall be determined by the court as a matter of law.
[N.J.S.A. 37:2-38.]
In considering the application of these statutes, the trial judge expressed uncertainty as to which statutory scheme should govern the enforceability of the agreement signed by Stacey and Edward.
In examining this point, we observe that N.J.S.A. 37:2-38 provides greater detail than N.J.S.A. 3B:8-10 as to how the enforceability of a premarital agreement should be determined. Accordingly, it is fair to conclude that in this context the former has filled any gaps that may have *93 existed in, and illuminates our understanding of, the more general terms of N.J.S.A. 3B:8-10. See Lewis v. Bd. of Trustees, Pub. Emp. Ret. Sys., 366 N.J.Super. 411, 417, 841 A.2d 483 (App.Div.) (quoting 2A Norman J. Singer, Sutherland Statutory Construction § 51:05 (6th ed.2000)), certif. denied, 180 N.J. 357, 851 A.2d 650 (2004). This approach is particularly apt since N.J.S.A. 37:2-38 was enacted after N.J.S.A. 3B:8-10. See Maressa v. New Jersey Monthly, 89 N.J. 176, 195, 445 A.2d 376, cert. denied, 459 U.S. 907, 103 S.Ct. 211, 74 L.Ed. 2d 169 (1982); Lewis, supra, 366 N.J.Super. at 418, 841 A.2d 483. However, we agree with the trial judge that we need not resolve the question of which statute governs because neither statute permits the enforceability of Stacey's waiver of her elective share. Like the trial judge, we agree that a plaintiff bears the burden of presenting clear and convincing evidence of the requirements of these statutes and that there is no material distinction between what N.J.S.A. 3B:8-10 refers to as "fair disclosure" and what N.J.S.A. 3B:2-38 describes as "full and fair disclosure."
The trial judge concluded that he had been presented with clear and convincing evidence that Edward made neither "fair disclosure" nor "full and fair disclosure." In his thorough oral decision, the judge found, among other things, that the book value of $635,000 listed in the agreement for Edward Shinn United Crane, Inc. grossly understated that entity's true value, observing that although the experts who testified disagreed about its value, the lower of the valuations "was more than three times the book value of the asset." In addition, the judge found that there was an inadequate disclosure of Edward's interest in Shinn Brothers Properties, although the value of this business was "much more modest," as well as an inadequate disclosure of Edward's interests in other listed properties and entities since the agreement said only that the value of those interests was "not available." And, the judge found that the agreement failed to contain a statement of Edward's yearly income of approximately $300,000, or an indication of the union benefits he was then receiving, or all the cash on deposit in banks he then possessed.
The judge explained the significance of Edward's failure to provide the disclosure required by the statutes in the following way:
See, the point of the disclosure is that somebody's being askedactually, both parties are asked to give up something under the agreement, but practically in this agreement, the only party really giving up anything is [Stacey]. The reason for that was that [Edward] did not give up anything. He did nominally, but he gave up his right to an elective share; he gave up his right to alimony, . . . and [he gave up his right to] shar[e] by way of equitable distribution in the assets of his wife, but she didn't have any assets.
Her disclosure indicates that she actually had a negative net worth at the time she entered into the agreement. She had, you know, credit card and other consumer indebtedness of $9,000 or so. She had less than $200 cash in the bank. She has a 1990 automobile. And she was making perhaps $15,000 a year as a bartender. Actually, I'm not sure whether she was still working when she signed the agreement; but in any event, if she was, that's the kind of money she was making.
Ed Shinn, on the other hand, had this very valuable business; he was making $300,000 a year, and he had a lot of other tangible . . . assets that Stacy didn't have.

*94 So when she surrendered equitable distribution rights, when she surrendered alimony rights, when she surrendered elective share rights, she was actually surrendering something that was conceivably worth a good bit of money. When Ed Shinn surrendered those things, it did not mean anything economically because, even in the absence of the agreement, even if he hadn't shed those things, they would not have been worth anything or would not have been worth much. So she was giving up a lot.
Now the point . . . of the full disclosure [required by statute] is, that if someone's going to consent to give up their rights, they have to understand what they're giving up.
. . . I mean, the point is, you have to know if you're going to give something up, you have to know what it is you're giving up, and you can't know what it is that you're giving up unless you have full disclosure.
The trial judge also found that the agreement did not contain an adequate written waiver of the right to full financial disclosure:
[Y]ou don't have to use exactly the same language which I mentioned in an earlier colloquy with counsel, but in order to meet that statutory test of express waiver of a right to disclosure beyond what one has received, one has to acknowledge, one has to know that . . . she . . . is not getting the disclosure called for by the statute, and the writing has to say, even though we're not getting the disclosure we're entitled to, we waive that, it's okay, we waive our right to it. There's nothing like that in this agreement, so there is no express waiver in writing of the kind called for by the statute. So a second condition, an alternative one to full disclosure, is missing. There's no full disclosure, there's no statutory waiver of full disclosure.
In fact, the judge indicated that some of the statements in the agreement's waiver provisions were "just contrary to fact" and were "[f]latly, totally wrong." Specifically, the judge pointed to the statement in the opening recitals that erroneously proclaimed that "the full nature and complete extent" of each party's property and sources of income were "heretofore disclosed to the other," and other statements in Section 7.1 that claimed each party
had the opportunity to ascertain and is fully acquainted with and aware of the full financial circumstances of the other party [and] has been informed of such financial circumstances by frank disclosure of the other, and [acknowledges] that all questions asked about the income, property, and worth of assets have been answered.
The judge emphasized that Edward's disclosures "were not accurate" because Edward "deliberately" refused to answer Rich's questions.
The judge also concluded that the circumstances set forth in N.J.S.A. 37:2-38(c)(3) were applicable because Stacey had no true understanding of Edward's property or financial obligations. He explained that, even though there was some evidence that Stacey lived comfortably with Edward before they married, knew that he had met all of her financial needs during that time, and had had some contact with his business, Stacey actually "had no real detailed sense of how much [Edward] was worth," and she "had no idea of what his income was." The judge summarized the significance of these findings in the following way:
[A]lthough [Stacey] had some idea that her husband was doing well, which was a correct idea, and that he had a meaningful net worth, which was correct, she *95 had no idea whether it was 600,000 or six million. And she simply did not have, within the meaning of the statute, adequate knowledge of the property and financial obligations of the party.
We review the judge's factual findings regarding the failure of the agreement to meet the requirements of either N.J.S.A. 3B:8-10 or N.J.S.A. 37:2-38, by applying the familiar standard that findings of fact should not be disturbed unless we are convinced that they are "so manifestly unsupported by or inconsistent with the competent, relevant and reasonable credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484, 323 A.2d 495 (1974). The trial judge's findings were thorough and well-supported by the evidence adduced during a nine-day trial. And, although a judge's "interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference," Manalapan Realty, L.P. v. Tp. Comm. of Tp. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995), we are satisfied that the trial judge accurately interpreted the requirements of N.J.S.A. 3B:8-10 and N.J.S.A. 37:2-38, and correctly applied those requirements to the facts as he found them. We thus discern no reason to disturb that part of the judge's decision which found that both N.J.S.A. 3B:8-10 and N.J.S.A. 37:2-38 rendered unenforceable Stacey's waiver of an elective share.

III
The judge, however, after determining that the agreement was unenforceable pursuant to either N.J.S.A. 3B:8-10 or N.J.S.A. 37:2-38, went on to enforce the agreement's waiver of the elective share by applying the doctrine of equitable estoppel.
According to the judge, he had "to look at tests that are somewhat broader and somewhat different than the statutory test, and that's the general test of fairness and equity, and the general concept of equitable estoppel and how that might relate to this case." In discussing his personal view of fairness in this context, the judge found that although Edward's refusal to discuss changes to the agreement, give additional financial disclosures, and marry without a signed agreement were "a little offensive," his actions were "not unconscionable," "outrageously offensive" or "legally unfair or equitably unfair," explaining:
[A]lthough it's kind of an awkward position for someone like [Stacey] to be in, it's the kind of thing that can go with the territory if you want to marry a somewhat older man who has been divorced and has young adult children and adolescent children, and wants to be somewhat calculating and cautious about protecting their rights and his rights.
. . . .
But in any event, she didn't have to marry him. She knew that signing this agreement was a condition precedent to marrying him. She knew what the agreement provided, and her lawyer had, he says, advised her about her rights, her general rights. And I think that is correct, he had. So she knew what she was giving up, and she knew that that was the condition to getting into the marriage, and she decided to go into the marriage.
Consequently, the judge held that it was "fundamentally unfair" for Stacey to be able, "now that her husband[,] who insisted on this as a condition precedent is dead, to walk away from that agreement and to have it set aside." Based upon these observations, the judge applied the doctrine of equitable estoppel in denying the relief that Stacey sought.
*96 The judge's determination that the doctrine of equitable estoppel could apply to enforce an agreement that was otherwise statutorily unenforceable is not entitled to any special deference. Manalapan, supra, 140 N.J. at 378, 658 A.2d 1230. That decision was erroneous because the trial judge overlooked the maxim that "equity follows the law," and, thus, mistakenly allowed his personal sense of fairness to override the statutory consequence of Edward's failure to comply with N.J.S.A. 3B:8-10 and N.J.S.A. 37:2-38, and the public policy embodied by those statutes.
Our Supreme Court has observed that "in ordinary circumstances equity follows the law" and that a departure from this maxim is normally permitted only "if extraordinary circumstances or `countervailing equities' call for relief." Monmouth Lumber Co. v. Indemnity Ins. Co. of No. Am., 21 N.J. 439, 451, 122 A.2d 604 (1956) (quoting Camden Trust Co. v. Handle, 132 N.J.Eq. 97, 108, 26 A.2d 865 (E. & A.1942)). In essence, the maxim does not bar the crafting of a remedy not recognized by legislation or found in the common law, but it does prevent the issuance of a remedy that is inconsistent with recognized statutory or common law principles. And, while in extraordinary circumstances, equity may "soften[] the rigor of the law," Giberson v. First Nat. Bank, Spring Lake, 100 N.J.Eq. 502, 507, 136 A. 323 (Ch.1927), it remains well-established that equity will not create a remedy that is in violation of law nor create a remedy where the law has recognized there can be no liability.
This modern understanding of when equity will follow the law was best stated in Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp., 100 N.J. 166, 183, 495 A.2d 66 (1985), where the Court recognized that "equity will generally conform to established rules and precedents, and will not change or unsettle rights that are created and defined by existing legal principles." This admonition that equity adhere to established legal principles applies most forcefully when the existing legal principle is in the form of either legislative regulation of the parties' rights or a legislative declaration of a public policy. Ibid.; Natovitz v. Bay Head Realty Co., 142 N.J.Eq. 456, 463-64, 59 A.2d 423 (E.&A.1948); Camden Trust Co., supra, 132 N.J.Eq. at 108, 26 A.2d 865; Karafa v. N.J. State Lottery Comm'n, 129 N.J.Super. 499, 505-06, 324 A.2d 97 (Ch.Div. 1974). See also Matter of the Estate of Cosman, 193 N.J.Super. 664, 670-71, 475 A.2d 659 (App.Div.1983) (holding that "[t]he principles of equitable fraud and promissory estoppel . . . are unavailing in the face of [an] unequivocal legislative declaration"). Were it otherwise, a judge's personal proclivities alone could negate the will of the Legislature.
Here, the trial judge found facts that were well-supported by the evidence and he correctly applied those facts in drawing the appropriate conclusion that N.J.S.A. 3B:8-10 and N.J.S.A. 37:2-38 precluded enforcement of Stacey's waiver of an elective share of Edward's estate. Notwithstanding, the trial judge then mistakenly utilized the doctrine of equitable estoppel to enforce that agreement. Because the applicable statutes so plainly required a judgment declaring unenforceable the agreement's waiver of Stacey's elective share, the maxim that "equity follows the law" required the judge's adherence to the public policy against enforcing such an agreement in these circumstances.
In addition, we conclude that even if the doctrine of equitable estoppel could have been considered in this context, those circumstances that the judge believed required *97 its invocation were actually circumstances considered by the Legislature when it enacted N.J.S.A. 3B:8-10 and N.J.S.A. 37:2-38. That is, the judge found that Stacey's choice was to either marry Edward and live with the consequences of the agreement, or refuse to marry him, and, having chosen the former, it would be unfair for her to attempt to avoid the agreement once Edward passed away. These facts, however, were inconsequential because N.J.S.A. 3B:8-10 and N.J.S.A. 37:2-38 clearly presupposed that such facts will be present any time those statutes have application. In other words, to have an elective share there had to be a marriage and the subsequent death of one of the spouses. And unless those circumstances and the execution of a premarital agreement occurred, there could be no controversy to which N.J.S.A. 3B:8-10 or N.J.S.A. 37:2-38 would apply. If those facts alone required the invocation of equitable estoppel, then it is difficult if not impossible to conjure a circumstance in which a premarital agreement could be held unenforceable pursuant to the aforementioned statutes. Accordingly, that these circumstances came to pass hereas they would in any case to which these statutes would applydoes not present a basis for estopping a surviving spouse from attacking an agreement that, in these circumstances, was found by clear and convincing evidence to be unenforceable. As we said in similar circumstances in Cosman, supra, 193 N.J.Super. at 671, 475 A.2d 659, "[w]ere we to enforce such [equitable] principles we would nullify the clear purpose of the statute."
Moreover, we are not persuaded even if equitable estoppel was applicable despite all we have saidthat it was otherwise appropriate to conclude that Stacey had acted inequitably by not refusing to marry Edward or by remaining silent about the unenforceability of the agreement until after Edward's death. In describing the circumstances in which equitable estoppel may apply, the Supreme Court has stated that "one may, by voluntary conduct, be precluded from taking a course of action that would work injustice and wrong to one who with good reason and in good faith has relied upon such conduct." Summer Cottagers' Ass'n of Cape May v. City of Cape May, 19 N.J. 493, 503-04, 117 A.2d 585 (1955) (emphasis added). See also Middletown Tp., Policemen's Benevolent Ass'n v. Tp. of Middletown, 162 N.J. 361, 367, 744 A.2d 649 (2000); City of Linden v. Benedict Motel Corp., 370 N.J.Super. 372, 393, 851 A.2d 652 (App.Div.), certif. denied, 180 N.J. 356, 851 A.2d 650 (2004). Although, in considering the application of equitable estoppel, the focus is largely on the party who has remained silent "when conscience requires him [or her] to speak," Besson v. Eveland, 26 N.J.Eq. 468, 472 (Ch. 1875), it still must be shown that the party's silence "would work injustice to another who, having the right to do so, has relied thereon," Summer Cottagers' Ass'n of Cape May, supra, 19 N.J. at 504, 117 A.2d 585 (emphasis added).
Here, Edward had no right to rely upon the future enforceability of the agreement. He stonewalled the requests of Stacey and her attorney for additional financial information in the face of the Legislature's declaration that he make "fair disclosure," N.J.S.A. 3B:8-10, or "full and fair disclosure," N.J.S.A. 37:2-38. Having deliberately refused to make such a disclosure and having failed to obtain a waiver of disclosure as permitted by these statutes, Edward had no right to assume that the agreement would be enforced in the future, and those who now seek to benefit *98 from his inequitable conduct cannot invoke the doctrine of equitable estoppel to defeat Stacey's legislatively-created right to be free from this unenforceable agreement.[6]
Ultimately, equity must never "knowingly become an instrument of injustice." Warner v. Giron, 141 N.J.Eq. 493, 498, 58 A.2d 98 (Ch.1948). See also Weisbrod v. Lutz, 190 N.J.Super. 181, 186, 462 A.2d 610 (App.Div.1983); Brower v. Glen Wild Lake Co., 86 N.J.Super. 341, 350, 206 A.2d 899 (App.Div.), certif. denied, 44 N.J. 399, 209 A.2d 139 (1965). By applying the doctrine of equitable estoppel, the trial judge mistakenly allowed Edward's estate to take advantage of Edward's inequitable wresting from Stacey her waiver of an elective shareconduct that, under the circumstances, was hostile to the will of the Legislature.
Reversed and remanded for further proceedings in conformity with this opinion.[7] We do not retain jurisdiction.
NOTES
[1] Edward's prior nineteen-year marriage produced three childrenJodi, Edward and Courtneyand ended in an acrimonious divorce in 1991. Testimony revealed that Edward was vexed during the matrimonial proceedings by the judge's examination of his businesses, and the questioning that he was required to endure regarding the valuation of his businesses.
[2] The agreement identified the Rockaway home as Edward's separately owned property, which, according to the agreement, would not be subject to equitable distribution.
[3] The agreement stated that: (a) if the parties divorced before their fifth wedding anniversary, Stacey would receive no alimony; (b) if the parties divorced on or after their fifth wedding anniversary, Stacey would be entitled to alimony of $10,000 per year "for a period equal to 50% of the number of years the parties were married prior to [the marriage's dissolution]"; and (c) if the parties divorced after their tenth anniversary, Stacey would be entitled to alimony based upon "the circumstances existing at that time." The agreement also contained Edward's waiver of any right he might have to alimony.
[4] A rider disclosing Stacey's assets was also appended to the agreement. This rider revealed that Stacey owned a 1990 Honda Prelude and $121.76 in cash, and was burdened by liabilities that totaled $10,150.16.
[5] At or about this time, Edward obtained a life insurance policy that provided $150,000 for Stacey upon his death.
[6] We also observe that in applying the doctrine of equitable estoppel the trial judge made no finding that Stacey executed the premarital agreement with the intent to defraud Edward or those who would take that part of the estate that she had ostensibly waived, such as occurred in Chrisomalis v. Chrisomalis, 260 N.J.Super. 50, 57, 615 A.2d 266 (App.Div.1992) (holding that "[t]he record amply supports the trial court's findings and conclusions that plaintiff sought to defraud decedent and his two sons when she executed the antenuptial agreement containing the waiver of her elective share in decedent's estate"). Accordingly, we find the trial judge's reliance upon Chrisomalis to be misplaced.
[7] In light of this disposition, we need not address Stacey's contention that the size of the lien imposed on Edward's estate pending a resolution of this appeal was inadequate.