**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2593-23

CENTER CITY PARTNERS, LLC,

    Plaintiff-Respondent,

v.

PATERSON PARKING
AUTHORITY,

    Defendant-Appellant.

_____

        Argued January 16, 2025 – Decided July 18, 2025

        Before Judges Mawla, Natali, and Walcott-Henderson.

        On appeal from an interlocutory order of the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-000103-21.

        William P. Opel argued the cause for appellant (McManimon, Scotland & Baumann, LLC, attorneys; William W. Northgrave, of counsel; William P. Opel, of counsel and on the briefs).

        Dennis J. Drasco argued the cause for respondent (Lum, Drasco & Positan, LLC, attorneys; Dennis J. Drasco and Scott E. Reiser, of counsel and on the brief).

PER CURIAM

Defendant Paterson Parking Authority (Authority) appeals from a March 15, 2024 order, which granted plaintiff Center City Partners, LLC's (Center City) request to reform redevelopment and operating agreements related to a substantial redevelopment project in Paterson's central business district. The project included two parking garages, an atrium building, and other residential and commercial development.

The redevelopment agreement obligated Center City to first construct a parking garage and, upon completion, required the Authority to construct a second garage, each at their own expense.[1] The redevelopment agreement also contained a complex revenue sharing formula where Center City was to receive a portion of the combined income from both garages in excess of $1,600,000. Although Center City constructed the project garage, the Authority never constructed the authority garage, and the revenue generated by only the project garage never exceeded $1,600,000. Thus, according to Center City, it never received any return on its investment.

---

[1] The parties refer to the parking garage constructed by Center City as the "project garage" and the garage the redevelopment agreement obligated the Authority to construct as the "authority garage." The parties also refer to the atrium building as the "mall." We do the same for ease of reference.

A-2593-23

After a four-day bench trial and a failed attempt at specific performance of the redevelopment agreement, detailed infra, the court reformed the revenue sharing provision by removing the $1,600,000 threshold to allow Center City to receive a portion of all revenue derived from the project garage. Because we have concluded the court's June 29 and March 12, 2024 oral decisions lack the necessary findings required by Rule 1:7-4, we vacate the March 15, 2024 order, in part, with respect to the reformation remedy and remand for further findings of fact and conclusions of law.

I.

In 2002, Paterson requested proposals for the redevelopment of the central business district, and accepted Center City's proposal by written memorandum of agreement the next year. In 2005, the Authority, Paterson, and Center City signed the redevelopment agreement, which governed the phased redevelopment plan. Under the redevelopment plan, Phase I implemented alternative parking and Phase II required Center City to construct the project garage. The parties stipulated that Center City completed the project garage in or around 2007. It expended approximately $25 million doing so. The later phases of the redevelopment plan, including construction of the authority garage, did not

A-2593-23

proceed as planned, in part due to the economic recession in 2008, and, as noted, the authority garage was never constructed.

As required by the project schedule and Section 8.2(a) of the redevelopment agreement, the Authority was required to construct the authority garage following Center City's completion of the project garage. Section 8.7(a) of the redevelopment agreement required Assured Guaranty, previously known as Financial Security Assurance, Inc., the third-party issuer of the Authority's outstanding parking revenue bonds, consent for "any activities that have the potential to impair the Authority's operations, financial security or revenue generation prospects[,] or . . . the issuance of additional obligations . . . to finance, among other things, . . . the [a]uthority [g]arage." Under Section 8.7(d), in the event Assured Guaranty did "not agree to insure the Authority's bonds or other obligations expected to be issued to finance the [a]uthority [g]arage, the parties agree[d] to negotiate other financial alternatives in good faith for a period of [ninety] days."

With respect to the above-referenced revenue sharing provision contained in Section 8.6(a) of the redevelopment agreement, Center City would receive 66.66% of the profits if the joint revenues of the garages exceeded $1,600,000 as of 2005, to be adjusted on an annual basis in accordance with the Consumer

4

Price Index. The Authority retained all revenues under the threshold and the remaining 33.34% of the revenue in excess of the threshold. Sections 8.2(e) and (f) required the parties to work cooperatively to establish a validation system, and that the Authority provide Center City with a report concerning the Authority's financial operations with respect to the project garage.

In 2006, the parties executed an operating agreement, which governed the operations of the project garage. That agreement provided the Authority would manage and operate the project garage while Section 6.2 obligated Center City to pay various operating expenses including: (1) an annual operating fee; (2) maintenance expenses; (3) insurance costs; and (4) direct payroll and benefits of Authority employees assigned to the project garage. According to Center City, the property taxes for the project garage have increased to approximately $800,000 per year. Further, it paid an average of $289,000 per year in operating expenses.

Unrelated to the redevelopment project, the parties stipulated at trial "[i]n or about 2018, the Authority initiated plans to demolish and replace [an] existing parking garage located at Ward Street" (Ward Street garage), while the authority garage remained unbuilt. They further agreed "[o]n August 20, 2018, the Authority submitted an application to the New Jersey Economic Development

5

Authority for financial assistance in the form of State incentive grants in connection with the Ward Street project." Ron Jampel, a real estate consultant who provided services to the Authority, testified that these grants could have been used to finance the authority garage.

After years of paying the operating expenses for the project garage, and because the Authority failed to construct the authority garage, which resulted in Center City's inability to share in the revenue, Center City eventually filed the operative ten-count complaint on May 4, 2021, seeking specific performance, an accounting of the Authority's operations of the project garage and other surface parking lots, reformation of the agreements, recission, and damages for unjust enrichment. It also sought damages for breach of contract, breach of good faith and fair dealing, and breach of fiduciary duties.

Center City contended the agreements had "only served to enrich the Authority at the expense of Center City." With respect to specific performance, Center City argued the Authority failed to fulfill its obligations to construct the authority garage, prevented Center City from satisfying its obligation to construct residential and commercial buildings by using the land on which those buildings would sit as surface parking lots, and therefore should be compelled to construct the authority garage and release the surface lots to Center City.

6

Center City next contended "[t]he Authority also failed to fulfill its contractual obligation under Section 8.2(e) of the [r]edevelopment [a]greement and Section 8.3(c)(iv) of the [o]perating [a]greement to provide Center City with monthly revenue/expenditure reports," and "grossly mismanaged the [p]roject [g]arage by offering complimentary or reduced rates." Because of the missing financial reports, Center City maintained it could not calculate its losses due to these alleged breaches.

Particularly pertinent to the issue raised on appeal, Center City requested the court reform the redevelopment and operating agreements as an alternative to specific performance. It argued the agreements "fail[ed] to effectuate the intent of the parties" and demanded the court "create a replacement standard to set reasonable parking rates for the [p]roject [g]arage," implement "an enforceable ticketing and validating system," and any further relief the court deemed appropriate.

In a separate count, Center City alleged that "[w]ithout having the construction of the [a]uthority [g]arage, residential building, and office building, Center City has been denied the benefit of the [r]edevelopment [a]greement as contemplated by the parties and has instead suffered ongoing financial losses as a result of the Authority's refusal to proceed with the [p]roject." Center City

7

accordingly demanded the redevelopment agreement be reformed to "account for the Authority's refusal to allow the latter phases of the [p]roject to proceed;" have "all capital and operating expenses of the [p]roject [g]arage . . . paid out of [the] revenue generated by the [p]roject [g]arage; . . . [d]irect[] that Center City . . . retain . . . all net revenues of the [p]roject [g]arage;" and other relief as the court deemed appropriate.

Center City also asserted two separate counts for breach of contract and alleged four separate breaches. Specifically, Center City maintained: (1) the Authority "diverted revenue from the [p]roject [g]arage through sub-market parking rate agreements, discount programs, and selective enforcement of parking charges" contrary to Section 8.5(c) of the redevelopment agreement; (2) "[c]ontrary to Section 8.2(e) of the [r]edevelopment [a]greement, the Authority failed to submit monthly revenue and expenditure reports to Center City, depriving Center City of the ability to verify or dispute charges demanded by the Authority"; (3) "[c]ontrary to Section 8.6 of the [r]edevelopment [a]greement, the Authority failed to share the revenues derived from parking it offered within the Project System"; and (4) the Authority failed to construct the authority garage.

The Authority filed an answer on June 8, 2021, and denied Center City's allegations. It also asserted counterclaims for breach of Section 6.2 of the operating agreement and unjust enrichment alleging Center City failed to pay the above-described operating fees or expenses since March 2020.

The Authority later moved for summary judgment, which the court denied along with the Authority's subsequent motion for reconsideration, and Center City's application to enjoin the Authority from continuing repairs on the Ward Street garage. The court granted Paterson's motion to intervene and as noted, a four-day bench trial was conducted in March and April 2022.

The court issued an oral decision on June 29, 2022, and memorialized its findings in a conforming order the next day. The court ordered the parties to specifically perform and recommence the project by obtaining the necessary approvals and satisfying financing contingencies set by the redevelopment agreement because it found the parties each represented that they wanted the project to proceed. The court explained "if updated approvals are obtained and the contingencies are met, then construction [is] to resume in the earliest possible time frame in accordance with the phasing plan" set forth in the agreements. If, however, the parties cannot specifically perform, the court instructed "the parties then shall confer pursuant to 8.7[(d)] of the

9

redevelopment agreement and negotiate for a period of [ninety] days after determination whether it's by assured guarantee or other alternatives . . . [i]ncluding whether Center City wants to subsidize construction of" the authority garage.

The court granted Center City's request for an "accounting of the operations and finance of the project garage and the surface lots in the project area since . . . 2009" and that those reports should be "furnished, not made available" to Center City. The court also awarded "compensatory damages for overpayment[] towards the expenses of the project garage, if any[,] as determined through [the] accounting."

In the event the specific performance remedy was unsuccessful, the court further stated, "the existing revenue sharing formula in the redevelopment agreement should be revised, and the entire operation and expenses of the project garage should be reconsidered." With respect "to the revenue sharing formula, the parties should create an equitable replacement formula that is consistent with the original intent of the parties, including revision of the [$]1.6 million . . . threshold" in addition to other changes pertaining to the operations of the project garage.

A-2593-23

The court further stated it did not believe that the Authority "never had any intention" to build the authority garage but that "there has to be a reformation . . . [b]ecause it would be . . . unconscionable if it was not" as, "[s]tanding alone, . . . there's no way for Center City to recoup the costs of th[e project] garage." The court reasoned "the Authority didn't act fraudulently or breach the contract . . . but if the project does not continue, this situation in the project garage is unconscionable."

With respect to the various causes of action for breach of contract, the court concluded the Authority did not breach the redevelopment agreement to the extent it required the Authority to construct a parking garage because the parties mutually agreed to put the project on hold. Specifically, it found the "parties had some sort of verbal dialogue, . . . an agreement[,] or . . . acquiesced somehow, that the project would just be stalled for at least a decade." Further, the court concluded the Authority did not breach the revenue sharing provision because, again, the parties were mutually responsible for the project's incompletion.

The court did not, however, make an explicit finding of breach with respect to the Authority's obligation under Section 8.2(e) to furnish financial reports but instead ordered an accounting of the garage's operations. The court

11

also did not find the Authority breached Section 8.5(c) concerning parking rate agreements, discount programs, and selective enforcement as the Authority was tasked with managing the garage.  Finally, the court dismissed Center City's claims for breach of fiduciary duty, breach of good faith and fair dealing, and concluded there was no basis for recission.

With respect to the Authority's counterclaims, the court found Center City breached Section 6.2 of the operating agreement by failing to pay certain expenses since March 2020.  As discussed herein, the court awarded the Authority damages for unjust enrichment in its later order.

In light of the court's June 30, 2022 order, the Authority submitted a proposal to construct the authority garage to Assured Guaranty, pursuant to Section 8.7(a).  Assured Guaranty denied the proposal.  Following this response, the parties conferred to negotiate options including waiver of the financing contingency, and alternative management and revenue sharing for the project garage, consistent with the court's order and Section 8.7(d).  The parties soon determined the negotiations were at an impasse and filed submissions informing the court.

On March 15, 2024, in response to being informed of the parties' failed attempts at specific performance, the court issued an order which:  (1) reformed

12

the redevelopment agreement, removed the $1,600,000 threshold, and afforded Center City the right to receive 66.66% of all revenue derived from the project garage after expenses; and (2) awarded Center City $499,007.77. In calculating this figure, the court retroactively applied the reformed revenue sharing provision and found Center City was owed $1,948,013.51. The court also concluded the Authority was owed $1,449,005.74 because of Center City's breach of Section 6.2 of the operating agreement due to its failure to pay certain expenses. Thus, the court offset these amounts and awarded Center City $499,007.77, to be paid over a twenty-four-month period.

We granted the Authority leave to appeal the March 15, 2024 order. The Authority also moved before the trial court to stay the order pending appeal, which the court denied. On June 14, 2024, we granted the Authority's application for a stay pending the outcome of the instant appeal.

Before us, the Authority argues Center City failed to establish the existence of either mistake, unconscionability, or fraud and, therefore, the court erred in reforming the agreements. The Authority contends the contracts, as agreed upon at the time of contracting by sophisticated entities represented by competent counsel and financial professionals, accurately represent the intent of

13

the parties. Thus, no mistake existed, which would warrant contract reformation.

The Authority further maintains "Center City . . . failed to demonstrate any instance of fraud or unconscionable conduct," and that the court's finding the current profit-sharing formula, absent construction of the remaining buildings, created an unconscionable result is unsupported in fact and inconsistent with the requirements for reformation. It contends a "perceived 'unconscionable' outcome does not equate to unconscionable conduct on the part of the Authority" as "[m]ulti-party real estate development projects . . . involve risk, and one party's disappointment with the resulting project does not mean the other acted in bad faith or contrary to the terms of the governing agreement."

In response, Center City argues the Authority merely challenges reformation but does not challenge the facts upon which the court relied in granting such a remedy. It maintains the court properly exercised its broad equitable discretion in fashioning a remedy to the unique circumstances of the case and, therefore, "did not need to make a finding of fraud or mistake to reform the [r]edevelopment [a]greement." Further, Center City contends the court properly held the inequitable distribution of revenue to the Authority while Center City bore the costs was "unconscionable" and "no matter how the [t]rial

14

[c]ourt labeled its March 15, 2024 [o]rder, whether as reformation, or a remedy for breach of contract, or otherwise (i.e., the form of relief), it directly addressed [the Authority's] significant misconduct and provided appropriate relief." Center City next argues, in the event this court finds reformation was inappropriate, "the most [we] could do would be to remand the matter to the [t]rial [c]ourt to oversee the imposition of the specific performance of th[e] agreements, which presumably would require [the Authority] to build the [a]uthority [g]arage."

The Authority disagrees and contends, with respect to a further attempt at specific performance, "the decision to construct the [a]uthority [g]arage is not in the sole discretion of the Authority" because of the financing contingency in Section 8.7(a). Thus, because it requested approval from Assured Guaranty following the court's June 30, 2022 award of specific performance and negotiated alternatives following Assured Guaranty's denial of their application, the Authority maintains it has fully complied with that order as well as its obligations under the agreement.

## II.

A trial judge's factual findings made following a bench trial are accorded deference and will be left undisturbed so long as they are supported by

A-2593-23

substantial credible evidence. Reilly v. Weiss, 406 N.J. Super. 71, 77 (App. Div. 2009) (quoting Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 483-84 (1974)). On the other hand, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (alteration in original) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). When issues on appeal present mixed questions of law and fact, we give deference to the supported factual findings of the trial court but review de novo the trial court's application of legal rules to the factual findings. State v. Pierre, 223 N.J. 560, 576 (2015).

Reformation of a contract is an "extraordinary remedy," Martinez v. John Hancock Mutual Life Insurance Co., 145 N.J. Super. 301, 312 (App. Div. 1976), that is justified only where there has been "mutual mistake or unilateral mistake by one party and fraud or unconscionable conduct by the other." St. Pius X House of Retreats, Salvatorian Fathers v. Diocese of Camden, 88 N.J. 571, 577 (1982). The party seeking reformation is required to present "'clear and convincing proof' that the contract in its reformed, and not original, form is the one that the contracting parties understood and meant it to be." Cent. State Bank

v. Hudik-Ross Co., Inc., 164 N.J. Super. 317, 323 (App. Div. 1978) (quoting Brodzinsky v. Pulek, 75 N.J. Super. 40, 48 (App. Div. 1962)).

Additionally, reformation of a contract "is not a modification. It is merely a recognition that the scrivener has failed to express accurately what the parties themselves intended and a correction of that failure." Aarvig v. Aarvig, 248 N.J. Super. 181, 186 (Ch. Div. 1991) (citing Capanear v. Salzano, 222 N.J. Super. 403, 407-08 (App. Div. 1988)). Courts should not "rewrite a contract for the parties better than or different from the one they wrote for themselves." Kieffer v. Best Buy, 205 N.J. 213, 223 (2011) (citing Zacarias v. Allstate Ins. Co., 168 N.J. 590, 595 (2001)).

We conclude the court's June 29 and March 12, 2024 oral decisions, with respect to the reformation remedy and its conclusion the Authority did not breach the redevelopment agreement in failing to construct the authority garage, would benefit from more fulsome factual findings. Rule 1:7-4(a) provides that "the court shall . . . find the facts and state its conclusions of law thereon . . . on every motion decided by a written order that is appealable as of right." "Meaningful appellate review is inhibited unless the judge sets forth the reasons for [their] opinion. In the absence of reasons, we are left to conjecture as to what the judge may have had in mind." Salch v. Salch, 240 N.J. Super. 441, 443

(App. Div. 1990); see also Estate of Doerfler v. Fed. Ins. Co., 454 N.J. Super. 298, 301 (App. Div. 2018).

As we extensively detailed in our June 14, 2024 order granting the Authority's application for a stay pending appeal, the court's oral decisions explained that changed circumstances, specifically the failure to construct the authority garage and Center City's inability to share in the profits, rendered the revenue sharing provision in the redevelopment agreement unfair and inequitable. Thus, the court implemented its own revenue sharing scheme to correct the perceived inequity. In light of the above-cited principles, however, reformation is not an appropriate equitable remedy to correct unfair circumstances, but is extraordinary relief reserved for situations involving either mutual mistake between the parties, or a unilateral mistake on behalf of one party and unconscionable conduct of the other. St. Pius X, 88 N.J. at 577.

"The doctrine of mutual mistake applies when a 'mistake was mutual in that both parties were laboring under the same misapprehension as to [a] particular, essential fact.'" Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 608 (1989) (alteration in original) (emphasis omitted) (quoting Beachcomber Coins, Inc. v. Boskett, 166 N.J. Super. 442, 446 (App. Div. 1979)). Unilateral mistake, on the other hand, contemplates a situation where "the mistake of one

party . . . was made as to a basic assumption . . . [that] has a material effect on the agreed exchange of performances that is adverse" to the mistaken party. Restatement (Second) of Contracts § 153 (Am. L. Inst. 1981). Finally, unconscionable conduct "implies [a] lack of 'good faith, honesty in fact[,] and observance of fair dealing.'" Cox v. Sears Roebuck & Co., 138 N.J. 2, 18 (1994) (quoting Kugler v. Romain, 58 N.J. 522, 544 (1971)).

Here, the court did not specifically address the legal requirements for reformation and as noted, awarded that extraordinary remedy to cure what it perceived to be an unconscionable or inequitable result. Based on our review of the record, it is not entirely clear how the court concluded reformation was appropriate. As the Authority notes, the parties are sophisticated entities, were represented by counsel, and agreed to the terms of the contract as written.

On the other hand, Center City alleges the Authority never intended to construct the authority garage and depleted its financial resources on unrelated projects, which led to its inability to perform under Section 8.2, that under the above-cited legal principles, constitutes unconscionable conduct. We reject Center City's argument the remedy was appropriate even though the court did not make findings of mistake or unconscionable conduct as equity must follow the law. See In re Est. of Shinn, 394 N.J. Super. 55, 67 (App. Div. 2007);

<u>Dunkin' Donuts of Am., Inc. v. Middletown Donut Corp.</u>, 100 N.J. 166, 183 (1985).

In addition, in light of our remand on the reformation remedy, we also conclude the court should make additional findings of fact, consistent with <u>Rule</u> 1:7-4, with respect to the Authority's alleged breach of Section 8.2(a) of the redevelopment agreement.  As noted, the court concluded the Authority did not breach Section 8.2(a) due to its failure to construct the authority garage as it found the decision to put the project on hold was mutual.[2]  It is unclear to us, however, what evidence or testimony the court relied upon in reaching this conclusion.

On this point, we note the testimony presented at trial appears contradictory.  Ekaterina Valiotis, an employee of Center City's management company who specifically managed the redevelopment project, testified the Authority "didn't want to build the [a]uthority garage."  She further stated the Authority's reasons varied but included that "there is no need for it, . . . [the Authority] might not have money, . . . capital improvements to make elsewhere,

---

[2]  We do not address, however, the court's conclusions with respect to the other causes of action for breach of contract as the Authority does not specifically raise those issues before us, and the court's determinations are supported by sufficient factual findings under <u>Rule</u> 1:7-4.

or, . . . another project somewhere else." Jose Perez, an Authority director, however, testified the "Authority did not build the garage because the Center City representatives asked [the Authority] not to build the garage, [and] that they had different plans in mind for the site," based on a purported conversation regarding the project.

Depending on the court's factual findings and legal conclusions, Center City may be entitled to damages or other equitable relief associated with this alleged breach. In light of this contradictory testimony, the importance of this issue, and court's limited findings, we are convinced the record would benefit from more in-depth findings and legal conclusions on this point.

Finally, we reject Center City's contention we should remand for the court to order and compel specific performance. As noted, the trial court previously attempted this remedy, and the Authority complied with its obligations to request financing and negotiate alternatives with Center City for a period of ninety days. To the extent Center City contends that without such an award it would be left without a remedy, as noted, on remand, the court shall address specifically the Authority's alleged breach of its obligation to seek financing and construct the authority garage in a timely manner.

21

Accordingly, we remand for the court to make findings as necessary to support its decision to reform the contract or devise an alternative remedy, if appropriate. If, on remand, the court concludes reformation was appropriate, it may reinstate its prior award to Center City. If, however, the court concludes reformation was improper on this record, the court shall reconsider the Authority's alleged breach of Section 8.2(a) for failure to construct the authority garage and, if appropriate, award compensatory damages.

Nothing in our opinion should be construed as suggesting our view on the outcome of the remanded proceedings. To the extent we have not specifically addressed any remaining arguments, it is because we have concluded they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Vacated in part, and remanded in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

A-2593-23